F I L E D
Clerk
District Court

NOV 08 2016

for the Northern Mariana Islands
By_____
(Deputy Clerk)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN MARIANA ISLANDS

COMMONWEALTH UTILITIES CORPORATION, ISMAEL CUENCO, ERIC TMASE, RUEL APURA, PETER DEPPAS, MARVIN MARCHADESCH, CARLITO MARQUEZ, ROSITO R. PALAD, GILBERT S. GATMAITAN, JOEL B. DUPRA, ANGELITO V. ABITONG, LOURD A. SAN ANTONIO, SAMUEL C. APOSTOL, JR., JASPER MONREAL,

        Plaintiffs,

vs.

JEH CHARLES JOHNSON, ET AL.,

        Defendants.

Case No.: 16-cv-00020

**DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## I.    INTRODUCTION

On June 29, 2016, the Commonwealth Utilities Corporation ("CUC") and 13 of its alien contract workers employed under the federal Commonwealth-only transitional worker program brought this action against Secretary of the Department of Homeland Security ("DHS") Jeh Charles Johnson, Director of Immigration and Customs Enforcement ("ICE") Sarah R. Saldana, and Director of U.S. Citizenship and Immigration Services ("USCIS") Leon Rodriguez (collectively "Defendants"), all in their official capacities, challenging the annual numerical limitations ("cap") for CW-1 transitional workers working in the Commonwealth of the Northern Mariana Islands. (Complaint, ECF No. 1.) Presently before the Court is Plaintiffs' Motion for

Preliminary Injunction to allow the individually named Plaintiffs to return to work or continue to work despite their permits' expiration dates (whichever the case may be), and to prevent Defendants from enforcing the published Fiscal Year 2016 CW-1 cap set by DHS for failure to comply with the Consolidated Natural Resources Act and the Administrative Procedure Act. Having considered the papers and arguments of counsel, the Court denies the motion for a preliminary injunction, for the reasons set forth below.

## II.    BACKGROUND

### A.  Factual Summary

In 2008, the U.S. Congress passed and President George W. Bush signed into law the Consolidated Natural Resources Act of 2008 ("CNRA") to "ensure uniform adherence to long-standing fundamental immigration policies of the United States." *See* Pub. L. No. 110-229, sec. 702(a), 122 Stat. 754, 854–55 (2008). In particular, Title VII of the CNRA provides that the immigration laws of the United States will displace those of the CNMI effective November 28, 2009. *Id.* § 6(a)(2). To minimize any potential disruption during this transition, Title VII directs DHS, through its Secretary, to establish, administer, and enforce a "transition period" to provide a means for foreign workers who are ineligible to enter or remain in the CNMI under the terms of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, to work lawfully in the CNMI during the transition period. *Id.* § 6(d)(2). Under the transition period, foreign workers may qualify as CW-1 transitional workers if they are: ineligible for any other employment-based nonimmigrant status under U.S. immigration law; will enter or stay in the CNMI to work in an occupational category designated as needing alien workers to supplement the resident workforce; are petitioned for and filed by an employer; are not present in the United States, other than the CNMI; are lawfully present in the CNMI; and are otherwise admissible to the United States or

2

are granted any necessary waiver of a ground of inadmissibility. 8 C.F.R. § 214.2(w)(2). While

the Secretary has broad discretion to determine how many CW-1 permits will be issued and in

what manner they will be allocated, the CNRA requires that the number of permits granted

annually be reduced each year until the number reaches zero at the end of the transition period.

48 U.S.C. § 1806(d)(2).

On October 22, 2015, USCIS announced that the CW-1 cap for FY 2016 would be set at

12,999. (Pl. Ex. 3, ECF 7-7.) Sometime after May 5, 2016, but before the expiration of the

individual Plaintiffs' respective CW-1 permits, CUC submitted renewal petitions to USCIS for

the 13 CW-1 plaintiffs. (Compl. 6–7.) These workers' permits expired on various dates during

the months of June, July, August, and September 2016. (Compl. 7.) In a letter to CUC dated June

8, 2016, DHS and USCIS notified Plaintiffs that all 13 renewal petitions had been rejected for

the following reasons: (1) USCIS had received a sufficient number of Form I-129CW petitions to

reach the CW-1 cap for FY 2016, (2) May 5, 2016, was the final receipt date for CW-1 worker

petitions requesting an employment start date before October 1, 2016, and (3) the petitions

arrived at the California Service Center after May 5, 2016, and did not quality for exemption

from the CW-1 cap. (Pl. Ex. 6, ECF No. 1-1.) Three weeks later, Plaintiffs filed this action.

### B.   The Complaint

Plaintiffs' Complaint[1] asserts two causes of actions. First, Plaintiffs allege that the failure

of USCIS to make a determination on Plaintiffs' CW-1 renewal petitions violates the

---

[1] Plaintiffs filed a Motion for Approval to File First Amended Complaint on October 28, 2016. (Pl. Mot to File FAC, ECF No. 28.) The Court granted the motion and accepted the Proposed First Amended Complaint as is. (Amended Order Granting Pl. Mot to File FAC, ECF No. 34.) While the Court's grant of the First Amended Complaint mooted Defendants' Motion to Dismiss, (ECF No. 19) it did not moot Plaintiffs' Motion for Preliminary Injunction (ECF No. 14) because Plaintiffs repled those same claims in the First Amended Complaint. For this reason, the decision

Administrative Procedure Act ("APA"), 5 U.S.C. § 501 *et seq.* (Compl. 11.) Second, Plaintiffs allege that the CW-1 caps set by DHS, through its Secretary, exceed the discretion given to the Secretary under the CNRA. In particular, Plaintiffs allege that the Secretary has failed to comply with the requirements of Title VII of the CNRA in setting the annual cap for CW-1 transitional workers for fiscal years 2013 through 2016 without first establishing and administering a regulated "system" and taking into consideration various statutory standards prior to adopting and publishing the cap. (Pl. Mot for Injunc. Relief and TRO, ECF No. 7 at 2.) This includes failing to establish a "system" based on any "reasonable method and criteria," failing to consider the Governor's comments and advice on the system, and failing to comply with the notice and comment requirements of Section 553(b) and (c) of the APA. (Compl. 14–17.)

### C.  Procedural History

On July 21, 2016, Plaintiffs filed a Motion for Injunctive Relief Including a Temporary Restraining Order, requesting that the Court allow the individually named Plaintiffs to return to work or continue to work despite their permits' expiration dates, and prevent Defendants from enforcing the published FY 2016 CW-1 cap. (Mot for Injunc. Relief, ECF No. 7.) Plaintiffs ask this Court to require DHS to order that Defendants comply with the CNRA and APA. (Pl. Reply, ECF No. 22 at 2.) As of August 20, 2016, four of the named CW-1 Plaintiffs have departed the island. (Opp'n, ECF No. 18 at 21.) Sometime after the motion was filed, the parties entered into an agreement whereby Plaintiffs would forego action on the TRO in exchange for Defendants' allowing the remaining nine CW-1 Plaintiffs to continue working during the pendency of this

---

may still reference the original complaint for the purpose of addressing the two claims on which the injunction is based.

matter. (Reply at 10.) Plaintiffs then amended the motion for injunctive relief to proceed and be heard solely as an application for a preliminary injunction. (Pl. Notice to Amend Mot for Injunc. Relief, ECF No. 14.) Defendants filed their opposition on August 20, 2016 (*See* Opp'n, ECF No. 18) to which Plaintiffs filed their reply. (*See* Reply, ECF No. 22.)

This matter came before the Court for oral argument on September 9, 2016. Attorney James Sirok appeared on behalf of Plaintiffs. Plaintiffs called Victor T. Flores, Operations Supervisor at CUC Power Generation, to testify. Attorneys Glenn Girdharry and Jessica Wessling appeared on behalf of Defendants. Defendants called David G. Gulick, District 26 Director of USCIS and Lead Official for implementation of the CNRA, to testify. The Court received nine exhibits into evidence at the hearing. In the event that the Court references an attachment to the pleadings that was not admitted at the hearing, the Court hereby admits it under Fed. R. Civ. P. 65(a)(2).[2]

### III.   LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council,* 555 U.S. 7, 24 (2008). The plaintiff must establish (1) a likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in plaintiff's favor, and (4) an injunction is in the public interest. *Id.* at 19. Alternatively, the court may issue a preliminary injunction if the plaintiff demonstrates that "serious questions going to the merits" have been raised and "the balance of hardships tips

---

[2] Fed. R. Civ. P. 65(a)(2) provides the following: "Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing. Even when consolidation is not ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial. But the court must preserve any party's right to a jury trial."

sharply in the plaintiff's favor" in addition to satisfying the other *Winter* factors. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–1135 (9th Cir. 2011) (*quoting Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)). A "serious question" is one in which the moving party has "a fair chance of success on the merits." *Sierra On-Line v. Phoenix Software*, 739 F.2d 1415, 1421 (9th Cir. 1984). Serious questions are "substantial, difficult and doubtful"; while they "need not promise a certainty of success, nor even present a probability of success, [they] must involve a fair chance of success on the merits." *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991) (internal quotation marks and citations omitted).

## IV.    DISCUSSION

### A.   Plaintiffs Are Not Likely To Succeed on the Merits

#### 1.     The CW-1 Classification Is Not a License under the APA

First, Plaintiffs argue that the action of USCIS in summarily rejecting its CW-1 renewal applications violates § 558 of the APA and provisions of Title VII of the CNRA. (Pl. Memo, ECF No. 7-1 at 14.) Pointing to the lack of a provision in either the INA or CNRA that exempts DHS, USCIS or ICE from not being required to comply with the APA provisions related to licenses and licensing, Plaintiffs contend that the CW-1 classification is a "license" as defined in the APA. *Id*. The APA defines license to include "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." 5 U.S.C. § 551(8). Furthermore, Plaintiffs argue that "when the licensee has made timely and sufficient application for a renewal or a new license in accordance with agency rules, a license with reference to an activity of a continuing nature does not expire until the application has been finally determined by the agency." *Id*. at 15 citing 5 U.S.C. § 558(c). Since Plaintiffs' renewal applications were filed prior to their expiration dates, Plaintiffs assert that the outright

rejection of their applications does not constitute a final determination on the applications. (Pl. Memo at 17.) Thus, they remain valid until DHS either grants or denies them. (*Id.* at 15.)

Neither Congress nor DHS has ever referred to the CW-1 classification as a "license" pursuant to 5 U.S.C. § 551(8), nor indicated any intent to extend the application of section 558(c) to any temporary foreign immigration benefits. *See generally* 48 U.S.C. § 1806; 8 C.F.R. § 214.2(w). In the CNRA, Congress has only used the terms "permit" or "visa" in reference to the type of status that foreign workers may hold under the transitional worker program. *See* 48 U.S.C. § 1806(d)(2)–(3). DHS, on its part, has adopted the term "permit" to refer to CW status. *See* 76 Fed. Reg. 55502 n.3 ("The CNRA refers to a system of permits. Note that we have retained this language when referencing the statute. In this context, however, the use of the term "permit" is synonymous with CW status[.]"). Moreover, the language in section 558(c) of the APA is limited to licenses "with reference to an activity of a continuing nature." Section 558(c)'s reference to "regularly issued licenses" suggests these licenses to be "an activity that is normally carried on indefinitely under licenses that as a regular matter are renewed or replaced with new licenses issued to the current holder." *Miami MDS Co. v. F.C.C.*, 14 F.3d 658, 660 (D.C.Cir. 1994) (*citing Pan-Atlantic Steamship Corp. v. Atlantic Coast Line*, 353 U.S. 436, 444–45 (1957) (Burton, J., dissenting)).  Qualifying licenses have included ones directing activities, such as radio broadcasting or shipping services, but have excluded dredge-and-fill permits that would be void on a specified date if the work was not completed by then. *Bankers Life & Cas. Co. v. Callaway*, 530 F.2d 625, 633–34 and 634 n.13 (5th Cir. 1976).

As Defendants aptly point out, the description of a "license" cannot apply to a CW-1 application since CW-1 applications do not refer to an activity of a continuing nature. First, Congress has characterized the CNMI CW-1 program as a "transition program" and mandated

the termination of CW-1 status by December 31, 2019. 48 U.S.C. § 1806(d)(2). Second, CW-1 status is not renewed as a regular matter of course. DHS has articulated which aliens may qualify as CW-1 nonimmigrants during the transition period, 8 C.F.R. § 214.2(w)(2); which employers are eligible to petition for a CW-1 nonimmigrant worker, 8 C.F.R. § 214.2(w)(4); and the required fees and documentation for each petition, 8 C.F.R. § 214.2(w)(5)–(6). Furthermore, an approved petition is only valid for a period of up to one year, 8 C.F.R. § 214.2(w)(13), at which point it will expire unless timely renewed and counted towards the annual cap. Because neither Congress nor DHS has ever referred to the CW-1 visa as a "license" nor expressed an intent to treat CW-1 petitions as such, the Court rejects Plaintiffs' interpretation of section 558(c) as applying to the CNMI-only transitional worker program.

   2.   *The 2011 Final Rule and Federal Register Notices Are Sufficient to Determine That A Flexible System Has Been Put in Place*

Second, Plaintiffs argue that DHS has failed to establish a "system," as required by the CNRA, related to setting the CW-1 cap through a regulatory scheme. (Pl. Memo at 17.) Congress has mandated DHS, through its Secretary, to administer the CW-1 transitional worker program:

> The Secretary of Homeland Security *shall establish, administer and enforce a system for allocating and determining the number, terms and conditions of permits* to be issued to prospective employers . . . In adopting and enforcing this system, the Secretary shall also consider, in good faith, and not later than 30 days after receipt by the Secretary, any comments and advice submitted by the Governor of the Commonwealth. This system shall provide for a reduction in the allocation of permits for such workers on an annual basis to zero, during a period ending on "December 31, 2019". In no event shall a permit be valid beyond the expiration of the transition period. This system may be based on any *reasonable method and criteria* determined by the Secretary of Homeland Security to promote the maximum use of, and to prevent adverse effects on wages and working conditions of, workers authorized to be employed in the United States, including lawfully admissible freely associated state citizen labor. No alien shall be granted nonimmigrant classification or a visa under this subsection unless the permit requirements established under this paragraph have been met.

48 U.S.C. § 1806(d)(2) (emphasis added). While Plaintiffs concede that the CNRA does provide

DHS with some discretionary authority in setting the annual cap (Pl. Memo at 17), Plaintiffs

stress that this discretion mandates consideration of various factors listed in Title VII of the

CNRA. (Pl. Memo at 17.) Congress intended the cap to:

> (2) minimize, to the greatest extent practicable, potential adverse economic and fiscal effects of phasing-out the Commonwealth's nonresident contract worker program and to maximize the Commonwealth's potential for future economic and business growth by—(A) encouraging diversification and growth of the economy of the Commonwealth in accordance with fundamental values underlying Federal immigration policy; . . . (B) recognizing local self government . . . through consultation with the Governor of the Commonwealth; (C) assisting the Commonwealth in achieving a progressively higher standard of living for citizens of the Commonwealth through the provision of technical and other assistance; (D) providing opportunities for individuals authorized to work in the United States, including citizens of the freely associated states; and (E) providing a mechanism for the continued use of alien workers, to the extent those workers continue to be necessary to supplement the Commonwealth's resident workforce, and to protect those workers from the potential for abuse and exploitation.

CNRA § 701(a)(2)(A)–(E). Moreover, in recognition of the CNMI's unique economic

circumstances, history, and geographic location, Congress intended that the CNMI "be given as

much flexibility as possible in maintaining existing businesses and other revenue sources, and

developing new economic opportunities" consistent with its congressional mandate. (*Id.* at §

701(b)). Plaintiffs argue that DHS's use of "varying and different considerations" on an annual

basis indicates that no system has been put in place to determine the annual CW-1 cap through a

regulatory scheme. (Pl. Memo at 18.) The issue here is whether DHS has established,

administered, and enforced a "system" using any "reasonable method and criteria" to determine

the annual cap for each fiscal year.

Section 706(2)(A) of the APA requires a reviewing court to uphold agency action unless

it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Ctr.

for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1042–43 (9th Cir. 2015)

(*quoting* 5 U.S.C. § 706(2)(A)). An agency action is arbitrary and capricious when the agency "relied on factors which Congress had not intended it to consider." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001). The APA does not apply, however, "to the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "Agency action is committed to the discretion of the agency by law when 'the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (*quoting Heckler v. Chaney,* 470 U.S. 821, 830 (1985)). Because Congress has directed DHS to not only annually reduce the number of CW petitions to zero at the end of the transition period, but also to consider specific factors during the establishment, administration, and enforcement of the transition period, a meaningful standard exists and judicial review is warranted.

DHS did not seamlessly implement the transitional worker program. In 2008, the CNMI government filed a lawsuit against the United States challenging the legality of certain provisions of the CNRA. *Commonwealth of the Northern Mariana Islands v. United States*, 686 F. Supp. 27 (D.D.C. 2009). In the midst of litigation, DHS published an interim final rule on the transitional worker program on October 27, 2009, with a 30-day comment period ending on November 27, 2009. 74 Fed. Reg. 55094-112 (Oct. 27, 2009). The CNMI government then filed an amended complaint, alleging violations of the APA due to the absence of any notice-and-comment period prior to promulgation of the interim final rule, and seeking an injunction with regard to implementation of the rule. *CNMI v. U.S.*, 686 F. Supp. at 27. The court granted the CNMI's motion for preliminary injunction on the ground that DHS did not have good cause to dispense with the APA's notice-and-comment procedures prior to promulgating the rule. *Id*. To provide

the CNMI government as well as the general public with sufficient opportunity to comment on the proposed transitional worker program, USCIS reopened the public comment period for an additional 30 days, ending on January 8, 2010. *See* 74 Fed. Reg. 64997 (Dec. 9, 2009). DHS duly promulgated its regulations when it published its final rule on September 7, 2011. *See* 76 Fed. Reg. 55502-39 (Sept. 7, 2011) (hereafter "Final Rule".)

Plaintiffs' challenge to DHS's "system" is fitting seeing as that word is not defined in the statute. *See generally* 48 U.S.C. § 1806. Unlike other provisions of the CNRA, there is no substantial "definitions" section under the provisions relating to the CNMI. Nor do the regulations define the word "system" or describe what the "system" may look like. *See* 8 C.F.R. § 214.2(w)(1). Whether DHS implemented a "system" therefore requires the Court to examine DHS's response to public comments regarding a system on the Interim Final Rule, as well as its reasoning articulated in the Final Rule and subsequent notices in the Federal Register for each fiscal year cap.

Prior to promulgation of the 2011 Final Rule, DHS received 146 comments on the Interim Final Rule from "a broad spectrum of individuals and organizations, including the CNMI Governor's Office, the Saipan Chamber of Commerce, a former Senator of the CNMI, and other interested organizations and individuals." 76 Fed. Reg. at 55504. Three commenters pointed out that DHS did not implement a transitional worker permit system as required by the CNRA. *Id.* at 55509. The commenters argued that DHS was required to establish and enforce a "system" for allocating transitional workers to employers or industries during the transition period (*citing* 48 U.S.C. § 1806(d)(2)), but in fact, no allocation criteria existed. *Id.* Further, one commenter contended that an annual determination was not an adequate substitute for such a process. *Id.*

In addressing those concerns, DHS reasoned that the CNRA required them to establish a permit system for prospective employers based on any reasonable method, which it interprets as being able to establish a classification within its own existing system. *Id.* Thus, the Final Rule "incorporate[s] standard elements of the Federal immigration system, including the DHS petitioning and classification process." *Id.* Furthermore, DHS points out that while the CNRA requires an annual reduction in the number of permits and total elimination of the classification by the end of the transition period, "[t]he CNRA does not dictate how this would occur." *Id.* Relying on its discretion, DHS believed that setting the cap for the first two years of the transition period, coupled with the Federal Register Notice for each fiscal year thereafter, would provide the public with sufficient notice and guidance to implement the required CW classification drawdown. *Id.*

Four commenters also questioned the lack of an existing system or plan to reduce the number of transitional workers as required under the statute. *Id.* at 55511. They argued that the rule only established a numerical cap. *Id.* The commenters stated that without a reduction plan, they could not operate their businesses nor plan for future access to foreign labor. *Id.* In particular, one commenter pointed out that the rule "did not identify any criteria or methodology that will be used to reduce the number of permits on an annual basis." *Id.*

In responding to the commenters' concerns, DHS admitted that it did not establish a *methodology* in the Final Rule for reducing the number of CW permits. *Id.* DHS "believes that any methodology will require flexibility to adjust to the future needs of the CNMI economy. A methodology or formula set forth in a regulation does not provide such flexibility." *Id.*; *see also id.* at 55534 ("DHS believes any methodology for allocating CW status will require flexibility to adjust to the prospering or declining needs of the CNMI economy. A methodology or formula set

forth in a regulation does not provide such flexibility."). DHS pointed out that the CNRA only requires that DHS reduce the number of transitional workers on an annual basis, 48 U.S.C. § 1806(d)(2), and does not mandate an actual specific reduction. *Id.* at 55511. DHS also admitted that it had not yet established a *system* and schedule for reducing the number of CW permits. *Id.* at 55530 ("DHS and U.S. DOL have not yet: (1) Established a system and schedule for allocating and reducing the number of grants of CW status and (2) decided whether or not to extend the transition period beyond 2014.") *Id.* Therefore, the Final Rule only gives notice of DHS's intent to exercise flexibility to adjust to the needs of the Commonwealth when setting the numerical limit. Whether DHS later established a particularized system for allocating and determining the number of CW permits requires the Court to examine the Federal Register notice for each fiscal year cap.

*FY 2011 and FY 2012.* DHS calculated the 2011 and 2012 caps by using the number of aliens lawfully present in the CNMI as of May 8, 2008, as stated in Governor Benigno Fitial's letter to DHS officials. (*See* Def. Ex. B, ECF No. 18-2.) ("The Commonwealth is currently enforcing the cap on foreign workers in the CNMI imposed by Public Law 110-229 effective as of its enactment on May 8, 2008. We have determined that 22,417 aliens were lawfully present in the CNMI who were entitled to work under various provisions of CNMI law." *Id.* at 2). DHS used the Governor's 22,417 figure to set the initial cap for FY 2011 at 22,417 and then reduced it by one for FY 2012. *See* 8 C.F.R. § 214.2(w)(1)(viii)(A), (B). DHS reasoned that the caps for the first two years were set to "ensure[] that employers had an adequate supply of workers for the projected CW nonimmigrant visas needed to transition umbrella permit holders to CW-1 status." *See* 77 Fed. Reg. 71287. The minimal decrease from 2011 to 2012 also gave DHS "the flexibility to adjust to the future needs of the CNMI economy and to assess the total alien workforce needs

based on the number of requests for transitional worker nonimmigrant classification received following implementation of the final rule." *Id*. While Governor Fitial recommended that no reductions be enforced during the first two years of the transition program (*see* Def. Ex. B, ECF No. 18-2) DHS came as close to his recommendation as statutorily permissible by only reducing the cap by one in 2012.

*FY 2013*. DHS calculated this cap by taking the number of CW-1 FY 2012 filings, rounding it to the nearest thousand, and adding 25 percent to account for economic growth. *See* 77 Fed. Reg. at 71288. DHS set this cap at 15,000 "based on the actual demonstrated need for foreign workers within the CNMI." *Id*. at 71287. First, DHS looked at the number of CW-1 petitions received for FY 2012—12,247. *Id*. ("Although DHS set the numerical limitation for FY 2012 at 22,416, employers in the CNMI have filed only 5,985 Petitions for CNMI-only Nonimmigrant Transitional Workers (Form I-129 CW), requesting a total of 12,247 transitional workers."). DHS reasoned that the number of requested CW-1 workers in the previous fiscal year is "an accurate baseline to use in determining the likely demand in FY 2013." *Id*. Second, DHS rounded the 12,247 figure to the nearest thousand—12,000. *Id*. Finally, DHS added 25 percent "to accommodate possible economic growth that might lead to a need for additional CW workers[.]" *Id*. While there is no acknowledgement of having received or considered any comments or advice from the Governor or any other individual or agency, USCIS District 26 Director David Gulick testified in the hearing that he did annually circulate the proposed notice to various government officials each year:

> In doing the proposed notice every year, we circulated to the Department of Interior, amongst other officials, and other interested parts of the Federal Government. And at least in the last two years, we definitely made a personal effort to come out and either talk by telephone and discuss what the cap would be or what their suggestions they had for the cap and to learn about the economic conditions in the CNMI at that

time, because those were things we considered very important in making a decision about the cap . . . . But I did in fact discuss the situation with the Governor.[3]

(Transcript at 58.)

*FY 2014.* DHS calculated this cap by taking the FY 2013 cap of 15,000 and reducing it by 1,000, or approximately 6.7 percent. *See* 78 Fed. Reg. at 58868. DHS set this cap at 14,000 "based on the actual demonstrated need for foreign workers within the CNMI." *Id.* at 58867. During the previous fiscal year, USCIS received CW-1 petitions for only 7,323 workers and "continues to believe that the number of requested CW-1 nonimmigrant workers in the previous fiscal year provides an accurate assessment to use in determining the likely demand in FY 2014." *Id.* USCIS attributed this low number to most CW-1 beneficiaries still holding valid CW-1 status until later in the year. *Id.* at 58868 ("Some employers may not have to file for their CW-1 nonimmigrant workers, to the extent that they plan to extend, until later in the year."). As a result, USCIS did not yet receive the total projected number for the actual permits granted in FY 2012 but anticipated their receipt later in the year. *Id.* Rather than rely on the previous year's *filings* as it did in setting FY 2013, DHS used the previous year's *cap* as the baseline and reduced it by 1,000. DHS reasoned that the number "will accommodate the staggered extensions for the 12,247 initial CW-1 nonimmigrant workers granted during FY 2012 . . . and will also accommodate possible economic growth[.]" *Id.*

*FY 2015.* DHS calculated this cap by taking the previous year's cap and reducing it by one. *See* Fed. Reg. 58241. DHS set this cap at 13,999. *Id.* In setting the cap, DHS considered its

---

[3] As the parties did not request a formal transcript from the Court reporter, references are to a rough, realtime draft transcript that the Court reporter provided to the Court. Where the transcript is quoted, its accuracy was checked against the audio recording of the hearing with any corrections shown in brackets.

effect in conjunction with the Secretary of Labor's extension of the CW program for an additional five years, through December 31, 2019. *See Secretary of Labor Extends the Transition Period of the Commonwealth of the Northern Mariana Islands-Only Transitional Worker Program,* 79 Fed. Reg. 31988 (June 3, 2014). DHS made a conservative reduction of one "because the new baseline must preserve access to foreign labor, as well as accommodate future reductions to the numerical limitations until the end of the transitional worker program." 79 Fed. Reg. at 58242. DHS chose to "preserve the status quo rather than implement a more aggressive reduction of CW-1 numbers" given the program extension. *Id.* Similar to the previous year, DHS used the *cap* of FY 2014 as the baseline. Unlike the previous year, however, DHS opted to reduce the cap only by one.

*FY 2016.* DHS calculated this cap by taking the previous year's cap and reducing it by 1,000 or approximately 7.2 percent. *See* 80 Fed. Reg. at 63912. DHS set this cap at 12,999. *Id.* Before setting the cap, DHS discussed its proposed cap with then Governor Eloy Inos by telephone on June 2, 2015 as well as in person at his office on July 8, 2015. (Gulick Decl. at ¶ 8, ECF No. 18-1.)  The Governor recommended reducing the cap by one to 13,998 CW-1 permits. *Id.* According to Gulick, DHS considered the Governor's advice, along with other applicable factors, and reduced the cap by 1,000 from the previous fiscal year. *Id.* One of those factors was that the 2015 cap was not met, with Defendants claiming that 4,390 available visas went unclaimed for that fiscal year.[4] (Opp'n at 4.) DHS also considered the cap's effect "in

---

[4] Defendants cited to a website in their Opposition to support the number of unclaimed visas in FY 2015. Upon reviewing the website, however, the Court could not confirm the number. Based on the absence of any announcement that the FY 2015 cap was ever reached, the Court deduces that the cap was *not* reached. To what extent, however, is unclear.

conjunction with the published media reports[5] indicating that the CNMI economy continues to

grow and that any reduction in the number of CW-1 workers available will have to account for

new investments and the expansion of existing businesses[.]" 80 Fed. Reg. at 63912.

Accordingly, the FY 2016 cap "preserve[d] access to foreign labor within the CNMI and

provide[d] a cushion for demand growth, yet provide[d] a meaningful reduction that aids DHS in

the implementation of the mandated cap reductions to zero over the transition period." *Id*.

     *FY 2017*. Most recently, DHS calculated this cap by taking the previous year's cap and

reducing it by one. *See* 81 Fed. Reg. 60581. DHS set this cap at 12,998. *Id*. It settled on this

number by acknowledging that the cap for FY 2016 was reached on May 5, 2016—the first time

the cap had been reached in the history of the CW program—and deciding to "preserve the status

quo, or current conditions[.]" *Id*. at 60582. It opined that the cap "preserves access to foreign

labor in the CNMI" while statutorily reducing the number of transitional workers from the

previous fiscal year. *Id*. Director Gulick expounded at the hearing that the reduction of one is

their "recognition that the situation exists and the cap—the situation—is still in flux[.]" (Tr. 70.)

It is also confirmation that they have "gotten people's attention that the situation cannot go on

beyond a reasonable doubt in 2019 without some statutory action." (Tr. 70.)

/ /

/

---

[5] *See* Cherrie Anne E. Villahermosa, *CNMI Sustaining Economic Growth Momentum,* Marianas Variety, June 30, 2015, *available at http://www.pireport.org/articles/2015/06/30/cnmi-sustaining-economic-growth-momentum-0* (last visited Nov. 3, 2016); *see also* Raquel C. Bagnol, *Labor Chief Says CW Allocation Needs to be Revisited,* Marianas Variety, June 17, 2015, *available at http://www.mvariety.com/cnmi/cnmi-news/local/77978-labor-chief-says-cw-allocation-needs-to-be-revisited* (last visited Nov. 3, 2016).

The following table summarizes the CW-1 caps:

| Fiscal Year (October 1 – September 30) | Cap | Rationale | Published in the Federal Register |
|---|---|---|---|
| 2011 | 22,417 | Used the exact number of aliens lawfully present in the CNMI as of May 8, 2008 | Sept. 7, 2011 |
| 2012 | 22,416 | Used the FY 2011 cap and decreased by one | Sept. 7, 2011 |
| 2013 | 15,000 | Used the actual number of FY 2012 filings (12,247), rounded it to the nearest thousand (12,000), and added 25% (3,000) | Nov. 29, 2012 |
| 2014 | 14,000 | Used the FY 2013 cap and reduced it by 1,000, or approximately 6.7% | Sept. 25, 2013 |
| 2015 | 13,999 | Used the FY 2014 cap and reduced it by one | Sept. 29, 2014 |
| 2016 | 12,999 | Used the FY 2015 cap and reduced it by 1,000 or approximately 7.2% | Oct. 22, 2015 |
| 2017 | 12,998 | Used the FY 2016 cap and reduced it by one | Sept. 2, 2016 |

Based on a review of the Federal Register notice for each fiscal year through FY 2017, this Court concludes that DHS has established, administered, and enforced a flexible system to "determin[e] the number, terms, and conditions of CW-1 permits." 48 U.S.C. § 1806(d)(2). It is clear that the first two caps of the transition program (FY 2011 and FY 2012) were reasonably based on Governor Fitial's initial figure as to the number of aliens lawfully allowed to work in the CNMI. As to the remaining caps, the Court finds those caps to also be validly based on several reasonable factors. These factors include examining the number of filings from the previous fiscal year; considering any comments and advice from the Governor, the Department

of Interior, and other federal officials; and providing a cushion to accommodate potential economic growth based on the number of unused permits from the previous fiscal year. Part of Plaintiffs' challenge to the "system" rests on the lack of transparency in setting the annual cap, but there is nothing that statutorily requires DHS to cite who it consulted, what external sources of information it used, what significant economic or other related events transpired that year, or how it arrived at a certain percentage or numerical reduction. *See generally* 48 U.S.C. § 1806. Moreover, the CNRA provides that the system "*may* be based on any reasonable method and criteria" as determined by the Secretary of Homeland Security. *Id.* at § 1806(d)(2) (emphasis added). In adopting the Final Rule, DHS concluded that it cannot apply a methodology without knowing the actual state of the CNMI economy in a given year. It has, however, considered the factors provided for in the CNRA as shown in the Federal Register notices and the evidence presented.  This Court concludes that DHS has complied with the CNRA to the extent that DHS has established, administered, and enforced a system to determine the number of CW-1 permits.

What Plaintiffs fail to address in its motion for injunctive relief, however, is the *allocation* of permits. As stated earlier, the CNRA requires that the Secretary of Homeland Security "establish, administer and enforce a system for *allocating* and determining the number, terms and conditions of permits." 48 U.S.C. § 1806(d)(2) (emphasis added). In the regulation, DHS implicates an allocation system by defining "occupational categories" as "those employment activities that DHS has determined require alien workers to supplement the resident workforce." 8 C.F.R. § 214.2(w)(1)(ix). This includes: "(A) Professional, technical, or management occupations; (B) Clerical and sales occupations; (C) Service occupations; (D) Agricultural, fisheries, forestry, and related occupations; (E) Processing occupations; (F) Machine trade occupations; (G) Benchwork occupations; (H) Structural work occupations; and

(I) Miscellaneous Occupations." *Id*. But besides defining and laying out the various occupational categories, DHS has not promulgated any rule or regulation showing how it is allocating the number of CW-1 permits among the various occupational categories for all foreign workers in the Commonwealth.

The lack of an allocation system was also brought up in the comments on the Interim Final Rule. Three commenters stated that DHS was required to provide criteria for allocating transitional workers to employers or industries during the transition period. 76 Fed. Reg. at 55509. Two of the commenters argued that no allocation criteria existed. *Id*. One commenter pointed out that the rule failed to describe a system or criteria "for allocating how the permits are to be divided among employers." *Id*. The third commenter noted that any system "will have to offer careful consideration to the economies of all three islands to avoid the harm that may result from the allocation of all slots to one island such as Saipan." *Id*. DHS responded to the commenters' concerns by stating that the CNRA requires it to establish a permit system based on any "reasonable method" so long as it annually reduces the number of permits to zero at the end of the transition period. *Id*. Moreover, "[t]he CNRA does not dictate how this will occur." *Id*. DHS's response to the commenters' concerns fails to provide the Court with sufficient evidence that an allocation system for CW-1 permits was properly established, administered, and enforced.

From Director Gulick's testimony at the hearing, it appears that DHS and USCIS only prioritize petitions based on the date they actually arrive in their offices. (Tr. at 70.) Thus, while the parties have not fully briefed the issue as to whether an allocation system exists or not, Director Gulick's testimony leads this Court to believe that no allocation system has been set in place. Rather, CW-1 permits are examined on a first-in, first-out basis without regard to the

occupational category the permit may fall under. Until the allocation issue is fully addressed, the Court cannot state that DHS has complied with the CNRA to the extent that it has established, administered, and enforced a system to *allocate* the CW-1 permits authorized.

Because the caps for fiscal years 2013 through 2015 were never reached and Plaintiffs' CW-1 petitions were granted, Plaintiffs have not been injured for those respective time periods. *See Rivas v. Rail Delivery Service, Inc.,* 423 F.3d 1079, 1083 (9th Cir. 2005) ("The district court thus should have dismissed Plaintiffs' claims for injunctive relief to remedy Truth-in-Leasing violations when Plaintiffs conceded a lack of injury.") Thus, the caps for fiscal years 2013 through 2015 cannot be enjoined.

As to the cap for FY 2016, Plaintiffs claim injury when their CW-1 renewal petitions were rejected, as well as suffering "legal wrong, or hav[ing] been adversely affected or aggrieved by [Defendants'] actions." (Compl. 18.) "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The phrase "legal wrong" under the APA is defined as "the invasion of a legally protected right." *Braude v. Wirtz,* 350 F.2d 702, 707 (9th Cir. 1965) (*citing Pennsylvania R.R. Co. v. Dillon,* 118 U.S. App. D.C. 257, 335 F.2d 292, 294 (1964)). Here, the individual Plaintiffs lack any legally protected right to seek admission to the CNMI, and therefore CUC, as the petitioning employer, lacks a right as well. The U.S. Supreme Court has stated that aliens "may not seek admission to this country under any claim of right but that such privilege is granted by the sovereign United States government." *Braude v. Wirtz*, 350 F.2d at 705 (*citing United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542-43 (1950)). "Normally Congress supplies the conditions of the privilege of entry into the United States. But because the power of exclusion of aliens is also inherent in the executive

department of the sovereign, Congress may in broad terms authorize the executive to exercise the power[.]" *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. at 543. As the CNRA indicates, the U.S. Congress has directed the Secretary of Homeland Security to set the conditions for admission for CW-1 workers under the transition program. 48 U.S.C. § 1806(d)(3). Since the Court has determined that DHS has established, administered, and enforced a system to set the cap, Plaintiffs' petitions were properly rejected under the system and injury cannot result from a valid cap. Without addressing the allocation part of the system, the Court recognizes that DHS's numerical limitation system involved careful consideration of the islands' economy close to the time at hand, the previous years' filings, and the comments and advice of the Governor and various government officials. As to enjoining the cap for FY 2017, which counsel for Plaintiffs brought up for the first time at the motion hearing, Plaintiffs have not shown injury, legal or otherwise, nor can they claim injury from an otherwise valid cap.

### 3.    *DHS and USCIS Properly Rejected Plaintiffs' CW-1 Renewal Petitions*

Plaintiffs also contend that Defendants' outright rejection of their CW-1 petitions for renewal fails to take into consideration whether or not they may have qualified for an exemption. (Pl. Memo at 16.) By May 5, 2016, USCIS received a sufficient number of CW-1 visa petitions to reach the cap for FY 2016. (Pl. Ex. 8, ECF No. 1-2.) On June 7, 2016, USCIS announced that extension of stay petitions for current CW-1 workers "will be accepted under certain circumstances." (Pl. Ex. 7; ECF No. 7-6.) Plaintiffs point out, however, that USCIS failed to delineate what the circumstances and exemptions were, and how petitioners could avail themselves of such exemptions. (Pl. Memo at 16.) Plaintiffs argue that once USCIS received a CW-1 petition after the cap had been reached, it should have determined whether the CW-1

worker qualified for an exemption, as opposed to summarily rejecting and returning Plaintiffs' petitions as if no cap exemption existed. (Reply at 11.)

Under 8 C.F.R. § 214.2(w)(20), USCIS may reject an employer's petition for new or extended CW-1 status "if the numerical limitation has been met." In such circumstances, the petition and accompanying fee will be returned with a notice that the cap has been met. *Id*. The rejection of a petition is distinct from the denial of a petition. While rejections are specific to petitions received after the cap has been met, 8 C.F.R. § 214.2(w)(20), denials may be made "for failure of the petitioner or the applicant to demonstrate eligibility or for other good cause." 8 C.F.R. § 214.2(w)(21). The denial of a petition to classify a foreign worker as a CW-1 worker may be appealed (Form I-290B, Notice of Appeal or Motion), but the denial of a grant, change of status, or extension of CW-1 or CW-2 status (referring to any dependents of a CW-1 worker) may not be appealed. *Id*. The regulations do not acknowledge any appellate process for the rejection of a petition. *See* 8 C.F.R. § 214.2(w)(20)

Here, USCIS complied with its rules and procedures when it rejected and returned Plaintiffs' CW-1 petitions. USCIS announced on its website that the CW-1 cap for FY 2016 was reached on May 5, 2016. (*See* Pl. Ex. 8.) The website announcement provided that USCIS will reject CW-1 petitions received after May 5, 2016 *and* that request an employment start date before October 1, 2016. (*Id.*) This included CW-1 petitions for extensions of stay that are subject to the CW-1 cap. (*Id.*) USCIS would also return any filing fees with any rejected CW-1 petition. (*Id.*) In this case, Plaintiffs submitted their CW-1 extension requests after the cap had been reached. (Pl. Ex. 6.) As a result, USCIS rejected Plaintiffs' petitions, returned their filing fees, and provided Plaintiffs with notice that the CW-1 cap for FY 2016 had been reached. (*Id.*)

Because the Court has already concluded that the cap set for FY 2016 is valid, adherence to this limit by DHS was mandated by the CNRA and accomplished by following the Final Rule.

Plaintiffs point out, however, USCIS announced on its website that it would accept certain petitions after the cap had been reached "under certain circumstances." (Pl. Ex. 7) ("We are clarifying that although extension of stay petitions for current CW-1 workers are counted toward the CW-1 cap, these petitions will be accepted under certain circumstances.") One of these circumstances is if the CW-1 worker's employment start date was on or after October 1, 2015. (*Id.*) ("If CW-1 workers were already counted toward the CW-1 cap for FY 2016, meaning that their previous employment start date was on or after October 1, 2015, then their employer can file a petition to change employers or extend CW-1 status in FY 2016, even though the FY 2016 CW-1 cap was reached on May 5, 2016."). While the rejection letter from USCIS did not indicate whether Plaintiffs' petitions were reviewed to verify the previous employment start dates (Pl. Ex. 6) USCIS may nevertheless reject the petitions if the cap has been met. *See* 8 C.F.R. § 214.2(w)(20). Moreover, Plaintiffs' use of the word "exemptions" is misplaced, as the announcement from USCIS was a mere clarification that petitions with a start date on or after October 1, 2015 were already counted toward the cap for FY 2016 but still needed to formally file a petition to extend status. Accordingly, the Court rejects Plaintiffs' claim that USCIS unlawfully rejected their petitions without proper consideration.

>    4.    *A Separate Notice and Comment Period Is Not Warranted for the Setting of Each CW-1 Cap*

Lastly, Plaintiffs argue that DHS failed to comply with the notice-and-comment requirements of section 553(b) and (c) of the APA. (Reply at 2.) In particular, Plaintiffs contend that DHS failed to provide advance notice of the publication of the annual cap or to provide the public with an opportunity to comment on the cap prior to publication. (*Id.* at 6.) As demonstrated

in the cap table above, with the exception of the FY 2011 and FY 2012 caps, DHS published notice of the caps in the Federal Register as little as five days prior to the start of the fiscal year, or as much as two months after the fiscal year had already started.

Before promulgating a new rule, federal agencies are generally required by the APA to give interested parties notice of the proposed rule's contents and "an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b), (c). An agency's discretion not to engage in rulemaking is entitled to a high level of judicial deference. *See Massachusetts v. EPA*, 549 U.S. 497, 527–28 (2007). Deference is called for where an agency's procedural regulations are involved. *See Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure . . ." (internal quotation marks omitted)). At the same time, however, an agency must provide a "reasoned explanation" for its refusal to initiate rulemaking. *Massachusetts*, 549 U.S. at 534.

Defendants may dispense with the APA notice-and-comment requirements when it "for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedures thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553 (b)((3)(B). Here, Defendants determined that it would be more appropriate to publish the CW-1 caps annually through the Federal Register than provide upfront a total CW-1 permit reduction plan in the Final Rule. *See* 76 Fed. Reg. at 55509. "As indicated in the interim rule, DHS will publish a Federal Register notice announcing the annual numerical limitation. DHS believes that the number of workers provided in the first years in this rule, coupled with the Federal Register notice, will be sufficient notice and guidance to implement the required CW classification drawdown." *Id*. DHS made clear that publishing notice

of the annual cap would "maximize the Commonwealth's potential for future economic and business growth by providing a flexible mechanism for the continued use of alien workers during the phasing-in of Federal immigration law." *Id.* at 55510.

To require a separate notice-and-comment period for the setting of each CW-1 cap would force the Secretary to use outdated data to be able to timely promulgate the cap. This would not be meaningful for the actual applicable period. Director Gulick testified that if USCIS solicited comments every year before publishing the annual cap, it "would probably have to begin the process at the very beginning of the fiscal year for the next fiscal year, at least." (Tr. at 91.) As to what would happen to the cap, Director Gulick stated that USCIS "probably would have issued one notice in the Final Rule that would have covered the entire transition period, which could have very well resulted in a rule that said it would be zero by 2014." (Tr. at 91-92.) At the time the Final Rule was promulgated, the program was to cease in 2014. Now, even if the Court were to order that DHS implement a notice-and-comment period for each year's cap, the result that the cap would change or that Plaintiffs would benefit is far too remote and speculative to act on. This cumbersome process would only serve to make it impractical for DHS to meaningfully implement the CNRA by providing a flexible mechanism for the continued use of alien workers during the phasing-in of Federal immigration law and yet reducing the CW-1 permits to zero. The APA allows the Defendants to dispense with the notice-and-comment requirements for good cause, and in this instance, it has exercised this authority. *See* 5 U.S.C. § 553 (b)((3)(B).

Taking into consideration all of the foregoing, the Court finds that Plaintiffs are unlikely to succeed on the merits.

### B.   *Plaintiffs Will Not Be Irreparably Harmed Absent Injunctive Relief*

Plaintiffs argue that they will likely suffer irreparable harm in the absence of an injunction because the CW-1 Plaintiffs are all technical specialists whose experience is necessary to maintain and repair the massive power generation engines at Saipan's main power plant. (Pl. Memo at 20.) According to Plaintiffs, the absence of these workers will lead to a deterioration in service to CUC's customers and to several critical entities, such as the hospital, schools, police and fire departments, and the airport. (*Id.* at 20.) Based on CUC Acting Executive Director Gary P. Camacho's declaration, the individual Plaintiffs provide over 91 years of experience at CUC's main power plant. (Gary Camacho Decl., ECF No. 7-3 at 5.) Without their expertise, Camacho argues that there will continue to be a "direct deterioration of service to the Utility's customers and the general public of the CNMI." (*Id.* at 6.)  This includes an increase in overtime pay to cover the lack of manpower, delayed preventative scheduled maintenance on generators and other equipment, and delayed projects and other scheduled maintenance. (*Id.* at 7.)

A plaintiff satisfies the irreparable harm requirement by demonstrating that irreparable injury is likely in the absence of an injunction. *Winter*, 555 U.S. at 22; *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (holding that the threat of irreparable harm must be immediate). "The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." *Sampson v. Murray,* 415 U.S. 61, 90 (1974).

Here, Plaintiffs have failed to show that they will likely be irreparably injured in the absence of an injunction. It is far too speculative that the issuance of an injunction directing DHS to essentially publish the steps it undertook in setting the FY 2016 cap will remedy Plaintiffs' injuries because it will not necessarily result in an increase in the FY 2016 cap or the grant of

27

their particular CW-1 renewal petitions as opposed to others also rejected after the cap was reached. As Defendants point out, Plaintiffs are familiar with the CW-1 program and very much aware that USCIS allows petitioning employers to file CW-1 renewal permits up to six months prior to the expiration of the permit. *See CUC v. Johnson*, No. 15-00023 (D.N.M.I.). Given that none of the renewals were filed more than four months before their expiration, and some as little as one month before, Plaintiffs' harm is to a certain extent self-inflicted.

Moreover, Victor Flores testified that CUC began a training program in 2013 with the help of the Northern Marianas Trade Institute to train mechanics and engineers for its power generation division. (Tr. at 25.) The program only lasted six months due to a heavy workload for the instructors who were all employed at CUC under the power generation division. (Tr. at 43.) After a two-year hiatus, CUC resumed its training program in February 2016. (Tr. at 43.) Each individual in the program is currently employed by CUC as a trades assistant electrician or mechanic. (Tr. at 45.) All of the trades technicians whom CUC has hired since January 2016 have been "local" from the CNMI or U.S. citizens. (Tr. at 32.)  Flores further testified that CUC has already begun planning for the end of the CW-1 transitional worker program in 2019 by training new and current employees. (Tr. at 48.) Flores is unaware of any efforts being made by CUC to replace CW-1 workers with workers from Guam or the mainland. (Tr. at 45.) When asked whether CUC has started training or recruiting students outside of CUC, Flores stated that he didn't think so. (Tr. at 46.)

Based on Flores' testimony, the Court finds that Plaintiffs have failed to demonstrate irreparable harm in the absence of an injunction. Flores testified to the existence of a training program for technical specialists and to CUC's efforts to hire "locals" from the CNMI or U.S. citizens to replace the CW-1 workers. Flores also insinuated that CUC may not have maximized

its efforts to recruit technicians from Guam or the U.S. mainland. Furthermore, any harm Plaintiffs may have suffered as a result of being rejected under the FY 2016 cap is no longer applicable as we are already one month into fiscal year 2017 and Plaintiffs were eligible to file new CW-1 permits beginning October 1. Furthermore, Plaintiffs were allowed to continue working pending the resolution of this case. Accordingly, the Court does not find irreparable harm.

### C. The Balance of Equities Does Not Tip in Plaintiffs' Favor and The Public Interest Does Not Weigh in Favor of Granting the Injunction

The final two factors required for preliminary injunctive relief—the balance of harm to the opposing party and whether the injunction serves the public interest—"merge when the Government is the opposing party." *See, e.g., Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court is required to identify the harms an injunction may cause to Defendants and to weigh those against Plaintiffs' threatened injuries. *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League,* 634 F.2d 1197, 1203 (9th Cir. 1980). The Ninth Circuit determined that "[t]raditional standards for granting a preliminary injunction impose a duty on the court to balance the interests of all parties and weigh the damage to each, mindful of the moving party's burden to show the possibility of irreparable injury to itself and the probability of success on the merits." *Id.*

Here, Plaintiffs argue that the injunction serves the public interest. Plaintiffs emphasize that the return of their foreign workers would prevent a deterioration in critical services and allow for the continuous maintenance of reliable power generation for Saipan. (Pl. Memo at 22.) More importantly, Plaintiffs assert that the public interest will benefit from such an injunction because thousands of petitions will be submitted for renewal during a period when the CW-1 caps for FY 2016 through 2019 are in place, and the conduct taken by DHS in setting the cap will continue to remain an open issue unless the Court makes a final adjudication. (*Id*. at 22.) A

ruling on Plaintiffs' motion for injunctive relief will therefore be applicable not only to Plaintiffs, but to thousands of CW-1 workers and their employers in similar situations as Plaintiffs. (*Id.* at 23.)

Defendants argue that requiring them to treat Plaintiffs' petitions—filed after the cap had been reached—differently from other rejected petitions "harms the integrity of the system, constitutes an unfair advantage over other petitioners, and is contrary to the public interest." (Opp'n at 23.) They contend that the issuance of an injunction would "render Congress's directives meaningless" and "require the agency to take affirmative action that is contrary to governing law, but, on a broader scale, . . . also undermine fundamental values underlying U.S. immigration policy." (*Id.* at 24.) Furthermore, if USCIS were to adopt the practice of granting renewal petitions after the cap has been reached, Congress's goal of replacing the CNMI's nonresident contract worker program with U.S. immigration laws "would never be fulfilled." (*Id.* at 25.)

Even if the Court granted the injunction, this would not necessarily require Defendants to provide additional CW-1 permits; rather, it would merely direct Defendants to carefully retrace its steps. At no point will an injunction assure with reasonable certainty a change in the CW-1 cap or in the acceptance of Plaintiffs' renewal petitions. The Court has already determined that it cannot enjoin enforcement of the CW-1 caps for fiscal years 2013 through 2015 due to the lack of injury to Plaintiffs. As to the FY 2016 cap, Plaintiffs are asking that this Court enjoin enforcement for a cap that was set through an undisclosed system, that has already been reached, and that applies to a fiscal year that has since elapsed. As mentioned earlier, the cap for FY 2016 was reached on May 5, 2016 (Pl. Ex. 8) and fiscal year 2017 began on October 1, 2016. The impracticality and burden upon Defendants to return to the FY 2015 cap, circulate a proposed

cap to the Governor and other government officials for comments, and revise the Federal

Register notice to reflect not only the system used but the various factors that were considered

greatly will create a disruption of the program and confusion among all CW-1 participants,

which outweighs any benefit an injunction would do for Plaintiffs. As Defendants aptly pointed

out at the hearing, other individuals whose petitions had also been rejected by the FY 2016 cap

have had to make arrangements to deal with their rejection for that fiscal year. (Tr. at 10.) How

DHS and USCIS will fairly and adequately handle those petitions in the event of an injunction

presents its own set of issues.

　　　In balancing the harm to both parties, the Court also considers the significance of the

extension of the transition period from December 31, 2014 to December 31, 2019. (*See* 79 Fed.

Reg. 31988.) If the original transition period were still in place, Plaintiffs' arguments infer that

DHS would have had to formulate some type of system in two years since the Final Rule only

laid out the caps for fiscal years 2011 and 2012. Given the fluctuating state of the CNMI's

economy, this request would have been unreasonable. Rather, DHS would have needed to

operate on its own flexibility and discretion. When in June 2014 the transition period was

extended to December 2019, the circumstances surrounding the transition period did not change.

In fact, DHS continued to need that flexibility and discretion even more so given that there was

an insufficient number of U.S. workers to meet CNMI businesses' current and projected needs.

　　　The Court's earlier determination that Defendants have a flexible system in place, albeit

not the most transparent, falls in favor of denying the injunction. It is too uncertain that an

injunction will provide Plaintiffs with any assurance that they personally will benefit. Thus, any

harm to the individual Plaintiffs and their employer is outweighed by the harm to Defendants.

*D.  Plaintiffs Have Not Demonstrated Serious Questions Going to the Merits and the Balance of Hardships Does Not Tip Sharply in Plaintiffs' Favor*

As stated earlier, the court may alternatively issue a preliminary injunction if the plaintiff demonstrates that "serious questions going to the merits" have been raised and "the balance of hardships tips sharply in the plaintiff's favor" in addition to satisfying the other *Winter* factors. *Cottrell*, 632 F.3d at 1134–1135 (*quoting McNair*, 537 F.3d at 987). A "serious question" is one in which the moving party has "a fair chance of success on the merits." *Sierra On-Line v. Phoenix Software,* 739 F.2d at 1421.

The Court has already determined that Plaintiffs are unlikely to succeed on the merits. The CW-1 classification is not treated as a "license" under the APA; Defendants have established a flexible system for determining the number of CW-1 permits; DHS and USCIS properly rejected Plaintiffs' CW-1 renewal permits; and a notice-and-comment period is not warranted in setting the annual CW-1 cap. While there is the possibility that Defendants lack a system for *allocating* permits, the Court reserves any judgment on this issue until the parties have fully briefed it. Moreover, the Court has also found that the balance of hardships does not tip sharply in Plaintiffs' favor because the 2016 fiscal year has already passed and mandating a notice-and-comment period for the setting of the numerical limit will not necessarily result in relief for the Plaintiffs. Finally, Plaintiffs have failed to satisfy the remaining *Winter* factors that irreparable harm will result in the absence of preliminary relief and that an injunction is in the public interest. *Id.* Plaintiffs have been allowed to continue working pending the resolution of this case. The Court therefore also denies Plaintiffs' motion for injunctive relief under the *Cottrell* standard.

## V. CONCLUSION

Given the unlikelihood that Plaintiffs will succeed on the merits of their claim and the lack of irreparable harm absent injunctive relief, the Court concludes that Plaintiffs have not established their entitlement to a preliminary injunction.

For the foregoing reasons, Plaintiffs' motion for preliminary injunction is denied.

SO ORDERED this 8th day of November, 2016.

RAMONA V. MANGLONA
Chief Judge