F I L E D
Clerk
District Court

MAR 13 2017

for the Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS**

COMMONWEALTH UTILITIES CORPORATION, ISMAEL CUENCO, ERIC TMASE, RUEL APURA, PETER DEPPAS, MARVIN MARCHADESCH, CARLITO MARQUEZ, ROSITO R. PALAD, GILBERT S. GATMAITAN, JOEL B. DUPRA, ANGELITO V. ABITONG, LOURD A. SAN ANTONIO, SAMUEL C. APOSTOL, JR., JASPER MONREAL.

            Plaintiffs,

vs.

JEH CHARLES JOHNSON, ET AL.,

            Defendants.

Case No.: 16-cv-00020

**DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

## I.    INTRODUCTION

Presently before the Court is Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint ("FAC") (ECF No. 38) pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Plaintiffs, the Commonwealth Utilities Corporation ("CUC") and 13 of its alien contract workers employed under the federal Commonwealth-only transitional worker program, seek to challenge the Department of Homeland Security's ("DHS's") administration of the annual numerical limitation ("cap") for CNMI-only transitional workers in the Commonwealth

of the Northern Mariana Islands ("CNMI"). Having considered the papers and arguments of counsel, the Court GRANTS Defendants' motion to dismiss the FAC, for the reasons set forth below.

## II.   BACKGROUND

### A.   *Factual Summary*

On May 8, 2008, the Consolidated Natural Resources Act of 2008 ("CNRA") became law. *See* Pub. L. No. 110-229, 122 Stat. 754 (2008). Title VII of the CNRA provides that the immigration laws of the United States will displace those of the CNMI effective November 28, 2009. *Id*. § 6(a)(2). To minimize any potential disruption during this transition, the CNRA authorized DHS to create a temporary CNMI-only transitional worker nonimmigrant ("CW-1") classification to allow certain alien workers to transition from the former CNMI foreign worker permit system to the U.S. immigration system for a period ending December 31, 2014. *Id*. The CNRA directed the Secretary of Homeland Security to "establish, administer, and enforce a system for allocating and determining the number, terms, and conditions of permits to be issued to prospective employers for each such nonimmigrant worker" who would not otherwise be eligible to enter, remain, or lawfully work in the CNMI under the terms of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq*. *Id*. § 6(d)(2). The CNRA also directed the Secretary of Labor to determine, not later than 180 days before the end of the transition period, whether an extension of the CW program for an additional period of up to five years is necessary, and further provided the Secretary of Labor with the authority to grant such an extension through notice in the Federal Register. *See* CNRA § 1806(d)(5). On June 3, 2014, the Secretary of Labor extended the CW-1 program for five years to end on December 31, 2019 based on the eight factors set out in the CNRA. 79 Fed. Reg. 31988. Six months later, Congress

2

amended the CNRA. *See* Consolidated and Further Continuing Appropriations Act of 2015, Pub. L. 113-235, § 10, 128 Stat. 2130, 2134 (Dec. 16, 2014) (amending 48 U.S.C. § 1806(d)). In the amendment, Congress eliminated the Secretary of Labor's authority to provide for future extensions of the CW-1 program and set the expiration date of the program to December 31, 2019, thereby ending the CW-1 program on that date. *See Id*. Congress also eliminated the eight factors to be considered by the Secretary of Labor when determining whether alien workers are necessary to ensure an adequate number of workers for legitimate businesses in the Commonwealth, and if so, the number of such workers that are necessary. *Id*. These amendments took effect prior to the beginning of Fiscal Year (FY) 2016.

In this case, DHS and U.S. Citizenship and Immigration Services ("USCIS") rejected CUC's renewal petitions for the 13 individual Plaintiffs for Fiscal Year 2016. The CW-1 cap for FY 2016, which ran from October 1, 2015 through September 30, 2016, was set at 12,999. (Pl. Ex. 3, ECF No. 7-7.) Sometime after May 5, 2016, but before the expiration of their current CW-1 permits, CUC submitted renewal petitions to USCIS for the 13 individual Plaintiffs. (FAC ¶ 30.) The individual Plaintiffs' permits expired on various dates during the months of June, July, August, and September 2016. (*Id*.) In a letter dated June 8, 2016, DHS and USCIS notified CUC that all 13 renewal petitions had been rejected due to the following reasons: (1) USCIS had received a sufficient number of petitions to reach the CW-1 cap for FY 2016, (2) May 5, 2016 was the final receipt date for CW-1 worker petitions requesting an employment start date before October 1, 2016, and (3) the petitions arrived at the California Service Center after May 5, 2016, and did not qualify for exemption from the CW-1 cap. (FAC ¶ 61; Attachment A; ECF No. 1-1.) Three weeks after receiving notice of the rejection, Plaintiffs filed this action.

//

**B.**     *Procedural History*

Plaintiffs filed their FAC on October 21, 2016. (FAC, ECF No. 35.) In the FAC, Plaintiffs assert four causes of action. Plaintiffs allege that the failure of USCIS to make a determination on Plaintiffs' renewal petitions violates the APA and 8 C.F.R. § 274a.12(b)(20) (*Id*. ¶¶ 53-66); that the manner and procedure utilized to publish the annual CW-1 caps for FYs 2013 through 2017 violate Section 553 of the APA (*Id*. ¶¶ 67-74); that they have suffered a legal wrong because of Defendants' conduct in setting the annual CW-1 caps for FYs 2013 through 2017 (*Id.*  ¶¶ 75-88); and that the manner and method utilized by Defendants related to the filing of renewal petitions operating in combination with enforcement of the CW-1 cap violate the constitutional due process and equal protection rights of Plaintiffs. (*Id.* ¶¶ 89-96.) Plaintiffs seek declaratory judgment that DHS's administration of the annual CW-1 cap for FYs 2013 through 2017 is (1) arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law; (2) contrary to Plaintiffs' constitutional rights; and (3) without observance of the procedure required by the APA and CNRA. (*Id.* ¶ 101.) They also seek injunctive relief to stop the Defendants from enforcing the cap and from preventing the individual Plaintiffs from continuing to work in the CNMI. (*Id*.)

Defendants move to dismiss the FAC under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim for relief. (Mot. to Dismiss FAC, ECF No. 38.) The matter came before the Court for oral argument on December 13, 2016 and the Court took the motion under advisement. (Minute Entry, ECF No. 42.) At the March 7, 2017 status conference, the Court announced its decision granting Defendants' motion to dismiss all of Plaintiffs' claims. This order sets forth the basis for the decision.

//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

### III.      LEGAL STANDARD

*A.      Federal Rule of Civil Procedure 12(b)(1)*

Under Fed. R. Civ. P. 12(b)(1), a defendant may challenge a plaintiff's jurisdictional allegations by either: (1) a "facial" attack that accepts the truth of a plaintiff's allegations but asserts that they are insufficient to invoke federal jurisdiction, or (2) a "factual" attack that contests the truth of a plaintiff's factual allegations, usually by introducing evidence outside the pleadings. *Leite v. Crane Co.*, 749 F.3d 1117, 1121-22 (9th Cir. 2014). The district court resolves a *facial* attack on its subject matter jurisdiction as it would a motion to dismiss under Rule 12(b)(6), by accepting plaintiff's allegations as true and drawing all reasonable inferences in plaintiff's favor, and determining whether the allegations are sufficient to invoke the court's jurisdiction. *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013). In resolving a *factual* attack on subject matter jurisdiction, a court may review affidavits or other evidence properly before the court without converting the motion to dismiss into a motion for summary judgment. *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003); *see also McCarthy v. U.S.,* 850 F.2d 558, 560 (9th Cir. 1988) ("the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction"). When a moving party "has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch.,* 343 F.3d at 1039 n.2. Here, Defendants are making a facial attack on this Court's jurisdiction based on the CNRA and the regulations promulgated thereto. In either case, the party

5

alleging subject matter jurisdiction has the burden of establishing it. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

      B.      *Federal Rule of Civil Procedure 12(b)(6)*

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the allegations set forth in the complaint. A plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (*quoting Twombly¸*550 U.S. at 556). The factual allegations taken as true must plausibly suggest an entitlement to relief, such "that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Bacca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

## IV.    DISCUSSION

      A.      *A Meaningful Standard Exists for which Judicial Review of DHS's Actions is Warranted*

Defendants move to dismiss the FAC for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) because they contend the language of the CNRA does not provide the Court any meaningful standard by which this Court may review DHS's exercise of discretion. Defendants argue that the methodology and criteria that DHS uses to administer the CW-1 visa cap is an action wholly committed to agency discretion by law. (Mot. to Dismiss FAC 5.) In particular, Defendants rely on Section 701(a)(2) of the APA which states, "This chapter applies, according to the provisions thereof, except to the extent that . . . agency action is committed to agency

discretion by law." 5 U.S.C. § 701(a)(2). As such, Defendants contend that Plaintiffs' claims are precluded from judicial review under the APA and must be dismissed under Rule 12(b)(1). *See Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (holding that the court lackedjurisdiction to review agency action where no "judicially manageable standard" exists when the Federal Aviation Act gave the Administrator unfettered discretion to renew or rescind designations "at any time for any reason the Administrator considers appropriate."). Plaintiffs assert that the CNRA does not explicitly provide that the annual allocation and determination of CW-1 permits by DHS is not reviewable, or that the Secretary's discretion in allocating and determining the CW-1 cap number is unfettered and unreviewable. (Opp'n to MTD 10). This Court agrees.

There is a strong presumption of reviewability under the APA. *Abbott Labs v. Gardner*, 387 U.S. 136, 140 (1967), abrogated on other grounds by *Califano v. Sanders*, 430 U.S. 99, 105 (1977) (holding that the APA did not afford an *implied* grant of subject matter jurisdiction permitting federal judicial review of agency action) (emphasis added). Section 706(2)(A) of the APA requires a reviewing court to uphold agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1042-43 (9th Cir. 2015) (*quoting* 5 U.S.C. § 706(2)(A)). The APA does not apply, however, "to the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Agency action is committed to the discretion of the agency by law when "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Steenholdt v. FAA,* 314 F.3d at 638 (*quoting Heckler v. Chaney,* 470 U.S. 821, 830 (1985)). However, the exception to reviewability under 5 U.S.C. § 701(a)(2) is a "narrow exception" applicable only where "statutes are drawn in such broad terms that in a given case there is no law to apply."

7

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1970) (internal quotations omitted), abrogated on other grounds by *Califano v. Sanders*, 430 U.S. at 105.

The language of the CNRA clearly mandates that DHS must act within certain parameters in establishing, administering, and enforcing the transition program. Congress has directed that the Secretary: (1) "shall establish, administer, and enforce a system for allocating and determining the number, terms, and conditions of permits"; (2) "shall also consider, in good faith . . . any comments and advice submitted by the Governor of the Commonwealth; (3) adopt and enforce a system which "shall provide for a reduction in the allocation of permits . . . on an annual basis to zero"; and (4) "shall set the conditions for admission of such an alien under the transition program[.]" CNRA §§ 1806(d)(2), (d)(3). In addition to these four requirements, the CNRA also contains discretionary language which provides guidance to the Court in assessing any agency action. The system "may be based on any reasonable method and criteria determined by the Secretary of Homeland Security to promote the maximum use of, and to prevent adverse effects on wages and working conditions of, workers authorized to be employed in the United States[.]" CNRA § 1806(d)(2). Thus, while Congress has not dictated how the Secretary of Homeland Security should provide for the annual reduction of CW-1 permits or specified to what extent the four requirements may be considered, the statute is sufficiently drawn such that this Court finds it has a meaningful standard for which to judge DHS's exercise of discretion.

In addition, DHS duly promulgated its regulations pursuant to the CNRA when it published its final rule on September 7, 2011. *See* 76 Fed. Reg. 55502-39 (Sept. 7, 2011) (hereafter "Final Rule".) In particular, the Final Rule promulgated in 2011 gives notice of DHS's intent to exercise flexibility to adjust to the needs of the Commonwealth when setting the numerical limit. Based on the Court's review of the Federal Register notices for each fiscal year through FY 2017 (Decision and Order Denying Injunc. ("Injunction Decision"), ECF No. 39 at 13-19), this Court concludes that

DHS has established, administered, and enforced a flexible system to "determin[e] the number, terms, and conditions of CW-1 permits." CNRA § 1806(d)(2).

Therefore, the Court has subject matter jurisdiction to determine whether DHS has acted contrary to law, in an arbitrary and capricious manner, or abused its discretion when setting the annual CW-1 caps for FYs 2013 through 2017. Accordingly, this Court denies Defendants' Rule 12(b)(1) motion to dismiss.

> **B.** *Even though judicial review is warranted, Plaintiffs fail to state a claim for which the Court can provide them with any relief*

Defendants alternatively move to dismiss Plaintiffs' FAC on all four claims for failure to state a claim under Fed. R. Civ. P. 12(b)(6) because their administration of the CW-1 visa cap is not arbitrary, capricious, or otherwise in violation of the APA, or in violation of any constitutionally protected interest.

> **1.** *Defendants Lawfully Rejected Plaintiffs' CW-1 Renewal Petitions*

In their first cause of action, Plaintiffs argue that Defendants' rejection of their CW-1 renewal petitions is not a final determination and therefore violates 5 U.S.C. § 558 of the APA and 8 C.F.R. § 274a.12(b)(20). (FAC ¶ 60.) Plaintiffs contend that CW-1 permits are "licenses" as defined in Section 551(8) of the APA. (*Id.* ¶ 54.) Under this theory, so long as CUC—the licensee—has made timely and sufficient application for license renewal in accordance with agency rules, the license of the 13 individual Plaintiffs does not expire until DHS and USCIS render a final determination. Plaintiffs take the position that since a rejection of a renewal petition is not a final determination, they assert that the 13 individual Plaintiffs may therefore continue to work for CUC up to 240 days past the expiration date of their current CW-1 permits until USCIS renders a final determination pursuant to 8 C.F.R. § 274a.12(b)(20). (*Id.* ¶ 66.)

9

a.      The CW-1 Classification is Not a License under the APA

Neither Congress in the CNRA nor DHS in its regulations has ever referred to the CW-1 classification as a "license" pursuant to Section 551(8) of the APA, nor indicated any intent to extend the application of Section 558(c) of the APA to any temporary foreign immigration benefits. CNRA § 1806; 8 C.F.R. § 214.2(w). Congress has only used the terms "permit" or "visa" in reference to the type of status that foreign workers may hold under the transitional worker program. *See* CNRA § 1806(d)(2), (d)(3). DHS has adopted the term "permit" to refer to CW status. *See* 76 Fed. Reg. 55502 n.3. "Licenses" refer to "activit[ies] of a continuing nature." 5 U.S.C. § 558 ("When the licensee has made timely and sufficient application for a renewal . . . in accordance with agency rules, a license with reference to an activity of a continuing nature does not expire until the application has been finally determined by the agency."). The APA's reference to "regularly issued licenses" suggests these licenses to be "an activity that is normally carried on indefinitely under licenses that as a regular matter are renewed or replaced with new licenses issued to the current holder." *Miami MDS Co. v. F.C.C.*, 14 F.3d 658, 660 (D.C. Cir. 1994) (finding that the subject permits to build a telecommunications facility were similar to a dredge-and-fill permit, which involved a "one-time activity" and would be "void on a specified date if the work was not completed by that date") (internal citations omitted).

Here, the description of a "license" cannot apply to a CW-1 permit because the CW-1 transition program only exists for a limited period of time. Congress has clearly characterized the CW-1 program as a "transition program" and mandated the termination of the program by December 31, 2019. CNRA § 1806(d)(2). CW-1 permits are not renewed as a regular matter of course. An approved petition is only valid for a period of up to one year, 8 C.F.R. § 214.2(w)(13), at which point it will expire unless timely renewed and counted towards the annual

cap. Accordingly, the CW-1 permit fails to meet the definition of a "license" under the APA and the individual Plaintiffs are not entitled to the protections of Section 558 of the APA with respect to licenses.

> b.    *USCIS's rejection of Plaintiffs' renewal petitions after the cap was reached constituted a formal and final determination*

Plaintiffs also rely on 8 C.F.R. § 274a.12(b)(20) to support their argument that USCIS unlawfully rejected their renewal petitions by "failing to make a formal determination" on the renewal petitions and instead "summarily reject[ing] the filings." (FAC ¶¶ 60-61.) Under 8 C.F.R. § 274a.12(b)(20), USCIS may authorize up to 240 days of continued employment authorization to nonimmigrant aliens within certain classes of aliens for extension of status:

> A nonimmigrant alien . . . whose status has expired but on whose behalf an application for an extension of stay was timely filed . . . [is] authorized to continue employment with the same employer for a period not to exceed 240 days . . . However, if the district director or service center director adjudicates the application prior to the expiration of this 240 day period and denies the application . . . , the employment authorization . . . shall automatically terminate upon notification of the denial decision[.]

*Id.* The additional 240 days applies to aliens with CW-1 status. 8 C.F.R. § 274a.12(b)(23). It was only until the FY 2016 cap was reached for the first time in the history of the CW program that USCIS needed to articulate the eligibility requirements for aliens with CW-1 status. An employee with CW-1 status may lawfully continue working for up to 240 days after the previously approved CW-1 status expires if: (1) the current employer files a CW-1 petition for FY 2017 asking to continue previously approved employment; (2) the employer files the petition before the CW-1 status expires; and (3) the employer asks to extend the employee's stay in the petition. U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *Temporary Relief for Workers with Expiring CW-1 Nonimmigrant Status*, https://www.uscis.gov/working-united-states/temporary-workers/cw-1-cnmi-only-transitional-worker/temporary-relief-workers-expiring-cw-1-

nonimmigrant-status (last visited March 13, 2017). USCIS further clarified that the CW-1

employee is not eligible for the 240 days "if USCIS *rejects* the employer's petition." *Id.*

In this case, Plaintiffs submitted their CW-1 renewal petitions for FY 2016 after the cap

had been reached on May 5, 2016. (FAC ¶ 61; Attachment A; ECF No. 1-1.) As a result, USCIS

rejected Plaintiffs' petitions, returned the petitions with the filing fees, and provided Plaintiffs

with notice that the CW-1 cap for FY 2016 had been reached pursuant to 8 C.F.R. §

214.2(w)(20). (*Id.*) Despite this rejection, the individual CW-1 Plaintiffs essentially argue that

they are automatically entitled to the 240 additional days because their renewal applications were

timely filed, USCIS did not adjudicate the applications, and there was no outright "denial"

pursuant to 8 C.F.R. § 274a.12(b)(20).

There is no dispute that Plaintiffs' renewal petitions were timely filed. (FAC ¶ 30.)

Plaintiffs submitted their renewal petitions some time in May 2016 for CW-1 permits that

expired during the months of June, July, August, and September 2016. (*Id.* ¶¶ 30, 39-40.) The

issue is whether USCIS adjudicated the applications. DHS had set the CW-1 cap for FY 2016 at

12,999 on October 22, 2015. *See* 80 Fed. Reg. at 63911. USCIS announced that this cap for FY

2016 was reached on May 5, 2016. (*See* Pls.' Attachment B, ECF No. 1-2.) Under the

regulations, USCIS "may reject an employer's petition for new or extended CW-1 status if the

numerical limitation has been met." 8 C.F.R. § 214.2(w)(20). By rejecting CW-1 petitions after a

cap has been reached, DHS "believes that this will allow for reduction in CW workers in

accordance with the numerical limitation." 74 Fed. Reg. at 55099. Upon receiving Plaintiffs'

renewal petitions, USCIS determined that a rejection was necessary because the cap had already

been met. *See* 8 C.F.R. § 214.2(w)(20).

While USCIS did not explicitly "deny" the renewal petitions pursuant to 8 C.F.R. § 274a.12(b)(20), its rejection of the petitions functioned as a denial and therefore constituted a formal determination. Under the INA regulations, if an alien's application for employment authorization is denied, the applicant is informed in writing of the decision and the reasons for the denial. 8 C.F.R. § 274a.13(c). No appeal is allowed from the denial of an application. *Id*. The rejection of a CW-1 petition functions in much the same way. USCIS may reject an employer's petition for extended CW-1 status if the CW-1 cap has been met. 8 C.F.R. § 214.2(w)(20). In such case, the petition and accompanying fee will be rejected and returned with a notice that the CW-1 cap has been met. *Id*. While the regulations are silent as to any appellate process for the rejection of a CW-1 petition, the Court finds persuasive that the rejection of an extension of CW status may not be appealed. *See* 8 C.F.R. § 214.2(w)(21). The only apparent difference between a "denial" and "rejection" of a renewal petition is that USCIS returns the fees with a rejection but not with a denial. The lack of an appellate process for the denial of a renewal petition, coupled with the statutory mandate to reduce the number of CW permits on an annual basis, leads this Court to conclude that USCIS has reasonably interpreted the rejection of a renewal petition as a "denial" under 8 C.F.R. § 274a.12(b)(20) which may not be appealed.

Furthermore, Congress has bestowed upon the Secretary of Homeland Security broad discretion to treat the rejection of a renewal petition as a formal and final determination. *See* CNRA § 1806(a)(2) (the Secretary "shall establish, administer, and enforce a transition program to regulate immigration to the Commonwealth"); *Id*. § 1806(d)(3) (the Secretary "shall set the conditions for admission of such alien under the transition program"). Defendants have promulgated regulations within its statutory authority under the CNRA, the INA, and its regulations including 8 C.F.R. § 274a.12(b)(20) and 8 C.F.R. § 214.2(w). Thus, there is nothing

to suggest that Defendants acted unlawfully by "rejecting" as opposed to "denying" the renewal

petitions. Petitioners were informed in writing of the decision, a reason was given for the

rejection, and the rejection was not subject to appeal. Because USCIS reached a final

determination on the renewal petitions, the individual CW-1 Plaintiffs were not entitled to

lawfully continue working for up to 240 days after expiration of their previously approved CW-1

status. DHS therefore complied with the CNRA and APA when it rejected and returned

Plaintiffs' CW-1 renewal petitions. The Court has previously determined the cap set for FY 2016

to be valid. (Injunction Decision 22.) Because Defendants lawfully adhered to the limit as

mandated by the CNRA in rejecting Plaintiffs' petitions, injury cannot result from the

enforcement of a valid cap. Based on the foregoing, the Court grants the motion to dismiss Count

1 of the FAC.

> ### 2. *Defendants Provided a Reasoned Explanation for Dispensing with the APA's Notice and Comment Requirements Prior to Publishing the Annual CW-1 Caps for FYs 2013 through 2017*

In the second cause of action, Plaintiffs allege that Defendants failed to comply with the

APA prior to adopting, implementing, and enforcing the CW-1 cap for FYs 2013 through 2017

because Defendants did not first publish them as proposed cap numbers, provide the public with

notice and an opportunity to comment, or publish the final cap number not less than 30 days

prior to their effective date. (FAC ¶ 72.) Plaintiffs contend that such actions and conduct by

Defendants "should be considered unlawful, should be set aside, and said Defendants should be

enjoined from further implementation or enforcement of said Cap numbers pursuant to the

provisions of the APA[.]" (*Id.* ¶ 73.)

Before promulgating a new rule, federal agencies are generally required by the APA to

give interested parties notice of the proposed rule's contents and "an opportunity to participate in

14

the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b), (c).

However, an agency "has broad discretion to choose how best to marshal its limited resources

and personnel to carry out its delegated responsibilities." *Massachusetts v. EPA*, 549 U.S. 497,

527 (2007) (*citing Chevron U.S.A. Inc. v. Nat. Res. Def. Council,* 467 U.S. 837, 842-845 (1984)).

An agency's discretion not to engage in rulemaking is "extremely limited" and "highly

deferential." *See Massachusetts v. EPA*, 549 U.S. at 527-528 (internal citation omitted); *New

York v. U.S. Nuclear Regulatory Comm'n*, 589 F.3d 551, 554 (2d Cir. 2009). An agency may

dispense with the APA notice-and-comment requirements when it "for good cause finds (and

incorporates the finding and a brief statement of reasons therefor in the rules issued)" that notice

and public procedures are "impracticable, unnecessary, or contrary to the public interest." 5

U.S.C. § 553(b)(3)(B). An agency must provide a "reasoned explanation" for its refusal to

initiate rulemaking. *Massachusetts v. EPA*, 549 U.S. at 534.

Plaintiffs challenge the annual caps published by Defendants pursuant to the Final Rule.

Defendants contend that they have provided a reasoned explanation to justify avoiding a notice-

and-comment period when setting the annual cap for every fiscal year. While the CNRA requires

an annual reduction in the number of permits and complete elimination of the CW classification

by December 31, 2019, the CNRA does not dictate how this will occur. Here, DHS determined

that it would be more appropriate to publish the CW-1 caps annually through the Federal

Register than to provide upfront a total CW-1 permit reduction plan in the Final Rule. 76 Fed.

Reg. at 55509 ("DHS believes that the number of workers provided in the first years in this rule,

coupled with the Federal Register notice, will be sufficient notice and guidance to implement the

required CW classification drawdown.") DHS reasoned that publishing the CW-1 cap annually

rather than providing an upfront permit reduction plan for the remaining two fiscal years that the

program would be in existence in the final rule provided the agency with flexibility to adjust the cap "due to the uncertainty of the CNMI's future workforce needs and economic conditions." *Id.* at 55510. By adopting this method, DHS sought to "maximize the Commonwealth's potential for future economic and business growth" through a "flexible mechanism for the continued use of alien workers during the phasing-in of Federal immigration law." *Id.* Furthermore, the Federal Register provides that the Secretary "has determined, in her discretion, that the annual numerical limitation will be published in a future Federal Register notice." *Id.; see* 8 C.F.R. § 214.2(w)(1)(viii)(D) ("DHS may adjust the numerical limitation for a fiscal year or other period in its discretion at any time via Notice in the Federal Register, as long as such adjustment is consistent with paragraph (w)(1)(viii)(C) of this section").

   This Court has also determined that requiring a separate notice-and-comment period for the setting of each CW-1 cap would force the Secretary to use outdated data in order to timely promulgate the cap. (Injunction Decision 26.) USCIS Director David Gulick testified at the hearing on Plaintiffs' motion for an injunction that assuming USCIS solicited comments every year before publishing the annual CW-1 cap, USCIS "would probably have to begin the process at the very beginning of the fiscal year for the next fiscal year, at least." (*Id.*) Moreover, Director Gulick stated that if the agency was required to conduct a separate notice-and-comment period for each CW-1 cap, USCIS "probably would have issued one notice in the Final Rule that would have covered the entire transition period, which could have very well resulted in a rule that said [the CW-1 cap] would be zero by 2014." (*Id.*) If the Court were to order DHS to implement a notice-and-comment period for each year's CW-1 cap, this process would only serve to hinder the agency from meaningfully implementing the CNRA by hindering the flexible mechanism needed during the phasing-in of Federal immigration law.

The Court finds that Defendants have shown good cause to dispense with notice-and-comment requirements when the Secretary set the annual CW-1 caps because, in this instance, the procedures are impracticable, unnecessary, and contrary to the public interest. 5 U.S.C. § 553(b)(3)(B). The Final Rule was to be valid for only two fiscal years, through December 2014. In 2014, when the expiration of the CW program was extended to December 2019, it gave DHS only five years to zero our the CW program. Every year, the one clear mandate from Congress has been to reduce the number of permits. DHS's flexible mechanism of publication via Federal Register notice, coupled with its reasoned explanation for dispensing with the notice-and-comment procedures for FYs 2013 through 2019, is consistent with DHS's congressional mandate under the CNRA and in compliance with APA rulemaking requirements. Taking into consideration all of the foregoing, the Court grants the motion to dismiss Count 2 of the FAC.

   3.   *Plaintiffs have not suffered a legal wrong because of agency action, or been adversely affected or aggrieved by agency action within the meaning of the CNRA*

In the third cause of action, Plaintiffs allege that the current cap setting system is not based on a reasonable method or criteria that encourages or promotes the maximum use of workers otherwise authorized to work in the United States. (FAC ¶ 82.) Plaintiffs argue that it is based on a method and criteria which "priorit[izes] within the CW-1 worker grouping and promotes the further use of alien workers employed in the construction industry to work in the CNMI for a temporary period . . . over those CW-1 workers, such as the individually named Plaintiffs[.]" (*Id.*) Plaintiffs further assert that Defendants' methodology in setting the annual cap does not comply with the CNRA to the extent that it fails to consider specific standards, factors, and criteria. (*Id.* ¶ 84.) As a result, Plaintiffs allege that Defendants have acted in an arbitrary and capricious manner by abusing the authority provided to the Secretary through the CNRA. (*Id.* ¶ 86.)

17

The APA affords judicial review to a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. The person claiming a right to sue "must identify some 'agency action' that affects him in the specified fashion[.]" *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 882 (1990). "Agency action" for purposes of Section 702 includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. § 551(13). The party seeking review under Section 702 must then show that he has "suffer[ed] legal wrong" due to the challenged agency action, or has been "adversely affected or aggrieved . . . within the meaning of a relevant statute." 5 U.S.C. § 702. Plaintiffs have not shown either.

The phrase "legal wrong" under the APA means "the invasion of a legally protected right." *Braude v. Wirtz*, 350 F.2d 702, 707 (9th Cir. 1965) (citing *Pennsylvania R.R. Co. v. Dillon*, 118 U.S. App. D.C. 257, 335 F.2d 292, 294 (1964)). The Court's inquiry is "to determine if [plaintiffs] have a legally protected right to be free of the effects ascribed to the administrative determinations." *Braude v. Wirtz,* 350 F.2d at 707; *see also Pennsylvania R.R. Co.,* 335 F.2d at 294. "The sufficiency of [plaintiffs'] allegations of 'legal wrong' thus depend upon congressional intent to bestow upon [plaintiffs] a legal right to protection[.]" *Pennsylvania R.R. Co.*, 335 F.2d at 295.

To be "adversely affected or aggrieved . . . within the meaning of a relevant statute[,]" the plaintiff "must establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the "zone of interests" sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. at 883 (citing *Clarke v. Sec. Indus. Ass'n.*, 479 U.S. 388, 396-97 (1987)). This zone-of-interest

18

test "is not meant to be especially demanding." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 132 S. Ct. 2199, 2210 (2012) (internal citation omitted). A plaintiff lacks prudential standing only if his "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id*. (internal quotation marks omitted). Because the plaintiff only needs to be "arguably" within the statute's zone of interests, "the benefit of any doubt goes to the plaintiff." *Id*.

Here, Plaintiffs assert in the FAC that they have been affected by the actions and conduct of DHS and USCIS related to setting the CW-1 caps for FYs 2013 through 2017. (FAC 20.) However, Plaintiffs have not shown injury, legal or otherwise, from the CW-1 cap for FY 2017, nor for FYs 2013-2015. For the period of FY 2013 through FY 2015, all individual Plaintiffs received their CW-1 permits. For this reason alone, there is no injury. The Court already refused to enjoin enforcement of the CW-1 caps for FYs 2013 through 2015 due to the lack of injury to Plaintiffs. (Injunction Decision 30.) As for the FY 2017 cap, DHS announced the FY 2017 cap would be set at 12,998 on September 2, 2016. *See* 81 Fed. Reg. 60581-82. On October 14, 2016, only two weeks into the new fiscal year, the agency announced that the FY 2017 cap had been reached. (Mot. to Dismiss FAC 20 n.9.) Plaintiffs did not allege sufficient facts in the FAC, which was filed after the FY 2017 cap was reached, showing injury by the FY 2017 cap being reached, or that any injury is judicially redressable. Plaintiffs may therefore only claim that they have been affected by the CW-1 cap for FY 2016, which is when the renewal petitions for the 13 individual Plaintiffs were rejected.

Plaintiffs fail to show that they have suffered a "legal wrong" as a result of DHS's actions for FY 2016. The individual Plaintiffs have not identified any legally protected right within the

CNRA which entitles them to be free from DHS's determinations regarding their admission to the CNMI. The CNRA clearly articulates that the Secretary of Homeland Security "shall set the conditions for admission of such an alien under the transition program." CNRA § 1806(d)(3). Nothing in the CNRA indicates that Congress intended to bestow upon the individual Plaintiffs a legal right to admission in the CNMI. In fact, aliens "may not seek admission to this country under any claim of right but that such privilege is granted by the sovereign United States government." *Braude v. Wirtz*, 350 F.2d at 705 (*citing United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542-43 (1950)). Congress usually sets the conditions of the privilege of entry into the United States, but "because the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power[.]" *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. at 543. Through the CNRA, Congress has clearly and explicitly bestowed upon the Secretary of Homeland Security the authority to set the conditions of admission for aliens under the transition program and did not create a legally protected right for the Plaintiffs.

It also follows that CUC, as the petitioning employer, lacks standing to claim a legally protected right to be free from DHS's actions as well. The Ninth Circuit has found Article III standing for *immigrant* visa petition beneficiaries, but it has yet to rule on whether beneficiaries for *nonimmigrant* visa petitions have Article III standing. *See Abboud v. I.N.S.,* 140 F.3d 843, 847 (9th Cir. 1998) (holding that the relative petition's beneficiary had standing to challenge the denial of a relative petition because "[t]he immigrant beneficiary is more than just a mere onlooker; it is her own status that is at stake when the agency takes action on a preference classification application."). The Court does not find persuasive the one case cited by Plaintiffs, *Tenrec, Inc., et al. v. USCIS and Leon Rodriguez, Director,* 2016 WL 5346095 (D. Or. 2016), to

support their argument that "they have standing to raise and prosecute the claim that they are being denied the due process and equal protection rights afforded under the United States Constitution." (Opp'n 18.) In *Tenrec*, the district court found the employee beneficiaries of the visa petition and their petitioning employers to have Article III standing. *Id.* at *5, *10. As to the individual Plaintiffs, the court found that they are "more than just a mere onlooker" because it is their "status that is at stake" when USCIS takes action on an H-1B petition. *Id.* at *6 (internal citation omitted). As to the petitioning employer, the court found that they had standing because the statute governing the review of H-1B visas required that USCIS review petitions in the order received, USCIS did not review petitions in the order received but instead reviewed them based on a random computer-generated selection process, and Plaintiffs' applications were rejected as a result of such process. *Id.* at *10.

Instead, the Court follows the holding in *Cost Saver Mgmt, LLC v. Napolitano,* 2011 WL 13119439 (C.D. Cal. June 7, 2011). The district court in *Cost Saver* held that plaintiff, a nonresident alien, lacked standing to bring suit based on the USCIS's denial of his immigration petition because he could not show an injury-in-fact as to his claims. *Id.* at *3. *Cost Saver* distinguished *Abboud* by finding that *Abboud* involved someone seeking an *immigrant* visa, which could eventually allow an individual to become a permanent resident of the United States, whereas the plaintiff in *Cost Saver* was seeking a *nonimmigrant* visa for a temporary employee. *Id.* at *4. The district court held: "Although the plaintiff beneficiary in *Abboud* 'lost a significant opportunity to receive an immigrant visa' and thus suffered a cognizable injury warranting federal court jurisdiction, the plaintiff beneficiary here has lost nothing other than the opportunity to reside temporarily in the United States, which does not amount to an Article III injury." *Id.* The same can be said here. The individual Plaintiffs have lost the opportunity to

reside and work temporarily in the CNMI under the CW "transition period" for this fiscal year in which no permit shall be valid beyond the expiration of the transition period. CNRA § 1806(d)(2). However, they may still petition for the opportunity to do so in future fiscal years.

In another district court case, the court found that the petitioning employer "must demonstrate that it has an 'already acquired' interest in the granting of the H1-B visa to which it is entitled." *Blacher v. Ridge,* 436 F.Supp.2d 602, 606 (S.D.N.Y. Feb. 3, 2006); *see Board of Regents v. Roth,* 408 U.S. 564, 576-77 (1972) (listing examples of 'already acquired' property interests). In *Blacher*, the petitioning employer failed to show that he had an already acquired interest in the granting of the alien's visa because the language of 8 U.S.C. § 1184(a)(1) clearly granted discretion to the Attorney General to determine whether the conditions for the visa had been met. *Blacher v. Ridge*, 436 F.Supp.2d at 607. The same can be said here. As the petitioning employer, CUC cannot show that it has an already acquired interest in the granting of the individual Plaintiffs' CW-1 permits. The CNRA clearly grants discretion to the Secretary of Homeland Security to set the conditions for admission of an alien to the CNMI under the transition program within its statutory mandate to annually reduce the number of CW-1 permits and terminate the program by December 31, 2019. CNRA § 1806(d)(2), (3). This includes creating a system for allocating and determining permits based on "any reasonable method and criteria determined by the Secretary of Homeland Security" that achieves the goals of the CNRA. CNRA § 1806(d)(2). In order to suffer a legal wrong, you need a legal right. Because CUC and the individual Plaintiffs have not shown a legal right to be free from DHS's determinations regarding their admission to the CNMI, this Court concludes that they have not suffered a legal wrong.

Plaintiffs also fail to show that they have been adversely affected or aggrieved within the meaning of the relevant statute because the Secretary has established a system for allocating and determining the number, terms, and conditions of permits based on a reasonable method and criteria. The mere fact that Plaintiffs failed to obtain any of the available permits for FY 2016 is not necessarily a redressable adverse effect.

Title VII of the CNRA provides that the Secretary of Homeland Security "shall establish, administer, and enforce a system for *allocating* and *determining* the number, terms, and conditions of permits." CNRA § 1806(d)(2) (emphases added). DHS's system for allocating CW-1 permits to qualified CNMI employers is on a "first-to-file basis, without regard to occupational category, until the cap is exhausted." (Reply 2; Testimony of District Director David Gulick.) DHS has not set any limitation or given preference on any occupational category. (Gulick Testimony, Tr. 9.) While there is nothing in the CNRA or its regulations that indicates that it be a first-to-file system, Congress intended for DHS to adhere "to long-standing fundamental immigration policies of the United States." Pub. L. No. 110-229, 122 Stat. 853, Title VII, §§ 701(a) and (b). Thus, DHS indicated in the Final Rule that the CW-1 program would "incorporate[] standard elements of the Federal immigration system, including the DHS petitioning and classification process[.]" 76 Fed. Reg. at 55509. The first-to-file system is consistent with the processing of other temporary worker programs under the INA, which have existed prior to Congress initiating the CW-1 transitional worker program. *See, e.g.,* 8 C.F.R. § 214.2(h)(8)(ii)(B) (H-1B petitions are processed "in the order in which petitions are filed," and approvals are not allocated based on specialty occupational categories). The Court finds the allocating of CW-1 permits on a first-to-file basis, without regard to occupational category, to be

a reasonable interpretation of its regulations and application of its duty to establish, administer, and enforce its allocation system.

As for *determining* the numbers, terms and conditions, this Court already concluded that DHS has established a "flexible system" for determining the number, terms, and conditions of CW-1 permits. DHS has in good faith, since the beginning of the transition period, considered the comments and advice of the Governor of the CNMI when setting the annual cap each fiscal year. (Injunction Decision 14-15.) In particular, District Director Gulick testified that at least for the last two years, his office made a personal effort to speak with the Governor of the CNMI, either in person or by telephone, to discuss what the cap should be and to learn about the economic conditions in the CNMI at the time. *Id*. DHS also determines its CW-1 cap for every fiscal year based on several reasonable factors. These factors include examining the number of filings from the previous fiscal year; considering any comments from the Department of Interior and other federal officials; and providing a cushion to accommodate potential economic growth based on the number of unused permits from the previous fiscal year. (Injunction Decision 13-19 (analysis of FY 2011- FY 2017 Federal Register announcements of annual cap)). Because the CNRA provides that the Secretary of Homeland Security has broad discretion to create a system based on "any reasonable method and criteria," CNRA § 1806(d)(2), this Court concludes that DHS has established, enforced, and administered a reasonable system to determine the number of CW-1 permits. Taken together, the Court cannot find that Plaintiffs were adversely affected or aggrieved by DHS's conduct within the meaning of the CNRA when DHS has set up a reasonable system for allocating and determining the number, terms, and conditions of CW-1 permits. Based on the foregoing, because CUC and the individual Plaintiffs lack Article III

standing to challenge any injury as a result of the FY 2016 cap, the Court grants the motion to dismiss Count 3 of the FAC.

       4.       *Plaintiffs fail to state a constitutional claim that would entitle them to any relief*

       In their final cause of action, Plaintiffs assert that the actions taken by DHS and USCIS "are contrary to the U.S. Constitutional due process rights of both [CUC] and the individually named Plaintiffs" because Defendants have not set forth a uniform published procedure or methodology for setting the CW-1 cap. (FAC ¶ 89.) In particular, Plaintiffs assert that 8 C.F.R. § 214.2(w)(12)(ii), which provides that a petitioning employer cannot file petitions for the renewal or extension of CW-1 workers more than six months in advance of their respective status expiration dates, resulted in the individual Plaintiffs "not [being] treated equally to other CW-1 petitioners and CW-1 workers within the one class of CW-1 petitioners and CW-1 workers " (*Id.* ¶ 93.) This is due to the fact that an alien whose CW-1 permit expires later in the year has a less likely chance of receiving a permit under the next fiscal year's cap than those aliens whose permits expire earlier in the year. (Opp'n 24.) Plaintiffs argue that this unequal treatment "violates [the individual Plaintiffs'] Fifth Amendment due process and equal protection rights under the U.S. Constitution" which "require[s] that they be treated as equally by DHS and USCIS as other CW-1 Petitioners and CW-1 workers such that a Cap preference or a priority is not given to certain members within this same CW-1 worker status." (FAC ¶ 94.) As a result of the six-month rule and its enforcement by Defendants, Plaintiffs allege that they have suffered and will continue to suffer irreparable harm and injury. (*Id.* ¶ 95.)

/ / /

/ /

/

25

*a.   Plaintiffs fail to state a cognizable due process claim*

A due process claim is cognizable only if there is a recognized liberty or property interest at stake. *Schroeder v. McDonald*, 55 F.3d 454, 462 (9th Cir. 1995); *McLean v. Crabtree*, 173 F.3d 1176, 1185 (9th Cir. 1999). Courts have determined that aliens have no property right in an immigration visa. *See United States ex rel. Knauff v. Shaughnessy*, 338 U.S. at 542 ("[A]n alien who seeks admission to this country may not do so under any claim of right . . . [it] is a privilege granted by the Sovereign United States Government . . . upon such terms as the United States shall prescribe."). Nor do aliens have a constitutionally-protected interest in the procedures by which such visas are obtained. *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs,* 104 F.3d 1349, 1353 (D.C. Cir. 1997). Moreover, a petitioning employer has no property right to have an alien admitted for employment purposes. *Spencer Enterprises, Inc. v. U.S.*, 229 F.Supp.2d 1025, 1043 (E.D. Ca. 2001), *aff'd,* 345 F.3d 683 (9th Cir. 2003) ("The corporation . . . has no constitutionally protected "property interest" to have an alien admitted into the United States for business purposes.").

Here, Plaintiffs cannot assert a cognizable due process claim based on Defendants' rejection of the individual Plaintiffs' renewal petitions for several reasons. The established case law clearly articulates that both the petitioning employer and alien beneficiary have no property right in an immigration visa. *See Shaughnessy*, 338 U.S. at 542; *Legal Assistance for Vietnamese Asylum Seekers*, 104 F.3d at 1353; *Spencer Enterprises,* 229 F.Supp.2d at 1043. To have a property interest in a benefit, the individual "clearly must have more than an abstract need or desire for it . . . [or] a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Plaintiffs simply cannot make a claim of legal entitlement based on existing case law.

26

Also, Defendants have not deprived Plaintiffs of any procedural due process rights because DHS lawfully promulgated regulations by which to enforce and administer the CW-1 visa cap. Under 8 C.F.R. § 214.2(w)(20), USCIS "may reject an employer's petition for new or extended CW-1 status if the numerical limitation has been met." Here, Plaintiffs' renewal petitions were received after the CW-1 cap for FY 2016 had been reached. Pursuant to its regulations, USCIS rejected and returned the petition and accompanying fee with notice that the CW-1 cap had been met. *Id.* As such, Defendants did not deprive Plaintiffs of their procedural due process rights. Any claim of substantive due process also fails since this Court earlier determined that an alien, and his or her petitioning employer, have no constitutionally protected interest in a CW-1 permit.

### b. *Plaintiffs fail to state a cognizable equal protection violation*

To state a claim for relief under the equal protection clause, a plaintiff must first allege "that two or more classifications of similarly situated persons were treated differently." *Gallegos-Hernandez v. United States*, 688 F.3d 190, 195 (5th Cir. 2012). Thus, the "[d]issimilar treatment of dissimilarly situated persons does not violate equal protection." *Klinger v. Department of Corrections*, 31 F.3d 727, 731 (8th Cir. 1994). The threshold inquiry in evaluating an equal protection claim is "to determine whether a person is similarly situated to those persons who allegedly received favorable treatment." *United States v. Whiton*, 48 F.3d 356, 358 (8th Cir. 1995). The Ninth Circuit has determined that because federal authority in the areas of immigration and naturalization is plenary, "[d]istinctions between different classes of aliens in the immigration context are subject to rational basis review and must be upheld if they are rationally related to a legitimate government purpose." *Tista v. Holder*, 722 F.3d 1122, 1126 (9th

27

Cir. 2013) (*quoting Aguilera-Montero v. Mukasey*, 548 F.3d 1248, 1252 (9th Cir. 2008) (citations and internal quotation marks omitted)).

Here, Plaintiffs' allegations amount to nothing more than USCIS's dissimilar treatment of dissimilarly situated CW-1 employer-petitioners. While all CW-1 petitioners are subject to the annual cap, USCIS has no control over an employer-petitioner's need for CW-1 workers, including when the employer-petitioner will submit a petition or when the employment of the CW-1 worker will begin. The very nature of the first-to-file system may appear to create a "preference" or "priority," but this is in no way an attempt by Defendants to treat two or more classifications of similarly-situated persons differently. Even though the CNMI is now experiencing a period of unprecedented economic growth that has increased the demand for CW-1 permits, Defendants are still bound by the CNRA's mandate to annually reduce the number of CW-1 workers until the end of the CW program. *See* CNRA at § 1806(d)(2); 8 C.F.R. § 214.2(w)(20). It is the demand for alien workers generated by the economy, not the unreasonableness of the first-to-file system, which has injured the Plaintiffs.

Additionally, the six-month restriction on filing a CW-1 renewal petition is rationally related to a government purpose.  USCIS does not allow a petitioning employer to file a CW-1 renewal or extension petition "earlier than six months before the date of actual need for the beneficiary's services." 8 C.F.R. § 214.2(w)(12)(ii). The six-month period gives the employer ample time to be able to recruit a U.S. worker. *See* 8 C.F.R. § 214.2(w)(4)(ii) ("To be eligible to petition for a CW-1 nonimmigrant worker, an employer must . . . [c]onsider all available United States workers for the position being filled by the CW-1 worker[.]"). The employer must also attest "as true and accurate that no qualified United States worker is available to fill the position" for which a CW-1 worker is being sought. 8 C.F.R. § 214.2(w)(6)(ii)(A). This regulation also

"helps prevent unscrupulous employers from obtaining a CW-1 visa number and 'shelving' the approval before they face an actual need for the services of the CW-1 worker." (Mot. to Dismiss 35.) The facts also show that Plaintiffs submitted renewal petitions *less* than six months prior to their respective expiration dates. (FAC ¶ 30.) This shows that Plaintiffs sat on their rights which cannot amount to an equal protection violation. For these reasons, Plaintiffs fail to state a cognizable equal protection claim and the Court grants the motion to dismiss Count 4 of the FAC.

## V.    CONCLUSION

Based on the foregoing, the Court grants Defendants' motion to dismiss Plaintiffs' First Amended Complaint on all four causes of action with prejudice under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. Although a district court should grant the plaintiff leave to amend if the complaint can possibly be cured by additional factual allegations, *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995), "[d]ismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment," *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008). The Court has determined that any amendment to the FAC would be futile. Judgment shall enter in favor of Defendants on all four claims accordingly.

SO ORDERED this 13th day of March, 2017.

RAMONA V. MANGLONA
Chief Judge